No. 25-1889

# United States Court of Appeals For the Eighth Circuit

NETCHOICE, LLC,
Plaintiff-Appellee,

v.

TIM GRIFFIN, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF ARKANSAS,
Defendant-Appellant.

On Appeal from the United States District Court
for the Western District of Arkansas
No. 5:23-CV-5105 (Hon. Timothy L. Brooks)

## Defendant-Appellant's Opening Brief

TIM GRIFFIN
  Arkansas Attorney General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL

101 West Capitol Avenue
LITTLE ROCK, AR 72201
(501) 682-2007
autumn.patterson@arkansasag.gov
noah.watson@arkansasag.gov
ryan.hale@arkansasag.gov

AUTUMN HAMIT PATTERSON
  Solicitor General

NOAH P. WATSON
  Deputy Solicitor General

RYAN HALE
  Senior Assistant Attorney General

*Counsel for Defendant-Appellant*

## Summary of the Case and Statement Regarding Oral Argument

In 2023, Arkansas passed the Social Media Safety Act to protect children from the dangers posed by unrestricted social-media access and to empower parents so they can better protect their children. It does so primarily by requiring that social-media platforms verify a user's age and, if that user is a child, parental consent before allowing the user to become an account holder. To further advance its compelling interests, Arkansas amended the Act, including altering some definitions, in 2025. This appeal involves the question of whether this appeal is moot (as discussed in the motion to dismiss that the Court carried with the case) as well as whether NetChoice proved it was entitled to summary judgment on its First Amendment and vagueness claims and whether the district court issued an overbroad judgment that exceeded its constitutional and statutory authority. Those questions, in turn, involve subsidiary issues, such as whether NetChoice has standing to assert a First Amendment claim on behalf of its members' users (including children whose interests are opposed to its members' interests), what level of scrutiny applies to the Act, and whether the Act is appropriately tailored to the State's interests.

Given the number of important, complicated questions this appeal raises, not to mention the procedural complexity, Defendant-Appellant respectfully requests 20 minutes for oral argument.

# Table of Contents

Summary of the Case and Statement Regarding Oral Argument ............................i

Table of Contents ...............................................................................................ii

Table of Authorities ...........................................................................................iv

Jurisdictional Statement ..................................................................................... 1

Statement of Issues ............................................................................................. 1

Statement of Case ...............................................................................................2

    A.   Unrestricted social-media use harms children. ..........................................2

    B.   Arkansas enacted, and then amended, the Social Media Safety
          Act to protect children ............................................................................8

    C.   NetChoice challenged the Act, and the district court purported
          to enjoin the Act ..................................................................................... 12

    D.   The district court denied the motion to alter the judgment to
          reflect the limits on its authority. ......................................................... 13

    E.   Amendments to the Act became effective pending appeal,
          raising questions about mootness and this Court's review. ..................... 15

Summary of the Argument................................................................................ 15

Argument........................................................................................................... 18

I.   Standard of Review...................................................................................... 18

II.  NetChoice Lacks Standing to Assert a First Amendment Claim
    Based on the Rights of its Members' Users .................................................. 19

III.  The Social Media Safety Act is Consistent with the
    First Amendment. ........................................................................................24

    A. At most, intermediate scrutiny applies to the Act. .................................24

      1.  The Act regulates conduct, not speech. ............................................25

      2.  Even if the Act burdens of regulates speech or expressive conduct, intermediate scrutiny applies............................ 31

   B.  The Act survives any level of scrutiny...................................................... 37

   C.  NetChoice has not carried its burden to prove a facial challenge..................................................................................... 46

IV.  The Social Media Safety Act Does Not Violate the Due Process Clause................................................................................................48

V.  The District Court Issued a Judgment that Exceeds Its Equitable Powers and is Overbroad. ............................................... 51

Conclusion.........................................................................................................56

Certificate of Compliance .........................................................................58

Certificate of Service.....................................................................................58

# Table of Authorities

**Cases**                                                        **Page(s)**

*Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*,
  37 F.4th 1386 (8th Cir. 2022) (en banc) ...........................................26

*Adam & Eve Jonesboro, LLC v. Perrin*,
  933 F.3d 951 (8th Cir. 2019) ...................................................2, 49, 51

*Bd. of Trs. of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989) ......................................................................... 37

*Bellotti v. Baird*,
  443 U.S. 622 (1979)......................................................................... 27

*Ben's Bar, Inc. v. Vill. of Somerset*,
  316 F.3d 702 (7th Cir. 2003) ........................................................... 29

*Brandt v. Griffin*,
  147 F.4th 867 (8th Cir. 2025) (en banc)........................................... 25

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 ...............................................................27, 39, 44, 45

*Buehrle v. City of Key West*,
  813 F.3d 973 (11th Cir. 2015)........................................................... 29

*Bush v. State*,
  2 S.W.3d 761 (Ark. 1999) ................................................................ 49

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .................................................................. 14, 52

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ....................................................................33, 35

*Commonwealth of Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ........................................................................ 53

*Comp. & Commc'ns Indus. Ass'n v. Uthmeier*,
  No. 25-11811, 2025 WL 3458571 (11th Cir. Nov. 25, 2025).........................*passim*

*Couch v. Am. Bottling Co.*,
  955 F.3d 1106 (8th Cir. 2020).............................................. 18

*Davenport v. Washington Educ. Ass'n*,
  551 U.S. 177 (2007) ......................................................... 31

*Davis v. FEC*,
  554 U.S. 724 (2008) ......................................................... 52

*Digital Recognition Network, Inc. v. Hutchinson*,
  803 F.3d 952 (8th Cir. 2015) ............................................ 55

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ......................................................... 21

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021) ............................................. 53

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ......................................................... 23

*Free Speech Coal., Inc. v. Paxton*,
  606 U.S. 461 (2025) .................................................*passim*

*Gary v. City of Warner Robins*,
  311 F.3d 1334 (11th Cir. 2002) ........................................ 29

*In re Gee*,
  941 F.3d 153 (5th Cir. 2019) (per curiam)................... 22, 55

*Ginsberg v. State of New York*,
  390 U.S. 629 (1968) ......................................................... 39

*Gold Cross Ambulance & Transfer v. City of Kansas City*,
  705 F.2d 1005 (8th Cir. 1983)..................................... 20, 21

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ......................................................... 48

*Harris v. Evans*,
  20 F.3d 1118 (11th Cir. 1994)........................................... 22

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
  452 U.S. 640 (1981)................................................29

*Hershey v. Jasinski*,
  86 F.4th 1224 (8th Cir. 2023).......................... 32, 52

*Hester v. United States*,
  586 U.S. 1104 (2019).........................................23

*Hill v. Colorado*,
  530 U.S. 703 (2000).........................................51

*Hodak v. City of St. Peters*,
  535 F.3d 899 (8th Cir. 2008) ..................... 1, 20, 24

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010)...............................2, 49, 50, 51

*Hughes v. City of Cedar Rapids*,
  840 F.3d 987 (8th Cir. 2016) ..............................24

*Indigo Room, Inc. v. City of Fort Myers*,
  710 F.3d 1294 (11th Cir. 2013)............................30

*Indus. Energy Consumers of Am. v. FERC*,
  125 F.4th 1156 (D.C. Cir. 2025) ..........................23

*J.D.B. v. North Carolina*,
  564 U.S. 261 (2011) .......................................27

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ................... 2, 54, 55

*Johnson v. United States*,
  576 U.S. 591 (2015) .......................................49

*Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*,
  864 F.3d 905 (8th Cir. 2017) ....................29, 34, 35

*June Med. Servs. LLC v. Russo*,
  591 U.S. 299 (2020) ................................. 20, 21

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ............................................................... 20, 21

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) .............................................. 28

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................ 52

*Lichtenstein v. Hargett*,
  83 F.4th 575 (6th Cir. 2023) ............................................ 26, 30

*Maryland v. Craig*,
  497 U.S. 836 (1990) ............................................................... 38

*Members of City Council of City of Los Angeles v. Taxpayers
  for Vincent*,
  466 U.S. 789 (1984) .......................................................... 21, 46

*Mitchell v. Dakota Cnty. Soc. Servs.*,
  959 F.3d 887 (8th Cir. 2020) ............................................... 39

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ..............................................17, 37, 46, 47, 48

*Nat'l Rifle Ass'n v. Bondi*,
  133 F.4th 1108 (11th Cir. 2025) (en banc) ....................... 27

*NetChoice, LLC v. Bonta*,
  152 F.4th 1002 (9th Cir. 2025) ............................................ 23

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................... 38

*NIFLA v. Beccera*,
  585 U.S. 755 (2018) ............................................................... 25

*O'Neill v. Louisville/Jefferson Cnty. Metro Gov't*,
  662 F.3d 723 (6th Cir. 2011) ............................................... 50

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ........................................................... 28, 45

*Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3d Cir. 2002) ........................................................ 1, 23

*Pierce v. Soc'y of the Sisters*,
268 U.S. 510 (1925) ................................................................... 39

*Redlich v. City of St. Louis*,
51 F.4th 283 (8th Cir. 2022) ................................................ 26, 27

*Reed v. State*,
957 S.W.2d 174 (Ark. 1997) ....................................................... 49

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .............................................................. 31, 37

*Rhodes v. Michigan*,
10 F.4th 665 (6th Cir. 2021) ...................................................... 23

*Rogers v. Scurr*,
676 F.2d 1211 (8th Cir. 1982) .................................................... 52

*Rosenstiel v. Rodriguez*,
101 F.3d 1544 (8th Cir. 1996) .................................................... 19

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ............................................................... 26, 27

*Schall v. Martin*,
467 U.S. 253 (1984) ............................................................. 38, 39

*Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*,
595 F.3d 588 (5th Cir. 2010) ..................................................... 53

*Smithfield Foods, Inc. v. Miller*,
367 F.3d 1061 (8th Cir. 2004) .................................................... 19

*Students Engaged in Advancing Texas v. Paxton*,
765 F. Supp. 3d 575 (W.D. Tex. 2025) ........................................ 24

*Swanson v. Hilgers*,
151 F.4th 992 (8th Cir. 2025) .................................................. 1, 20

*TikTok Inc. v. Garland,*
   604 U.S. 56 (2025) ...................................................................*passim*

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ....................................................................52

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ........................................................ 2, 52, 56

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) ...................................................31, 34, 36, 37

*Turner Broad. Sys., Inc. v. FCC,*
   520 U.S. 180 (1997) .............................................................16, 37

*United States v. Albertini,*
   472 U.S. 675 (1985) ............................................................ 38, 43

*United States v. Concepcion,*
   139 F.4th 242 (2d Cir. 2025) ...............................................50

*United States v. Hansen,*
   599 U.S. 762 (2023) .............................................................17, 47

*United States v. O'Brien,*
   391 U.S. 367 (1968) ............................................................. 31

*United States v. Palmer,*
   917 F.3d 1035 (8th Cir. 2019) ...............................................49

*United States v. Williams,*
   553 U.S. 285 (2008) ........................................................... 2, 49

*Vidal v. Elster,*
   602 U.S. 286 (2024) .............................................................28

*Virginia v. Hicks,*
   539 U.S. 113 (2003) .............................................................29

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) .......................................................18, 43, 49

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ......................................................................... 43, 44

**Statutes & Rules**

15 U.S.C. § 6502 ...........................................................................................48

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1331 ............................................................................................. 1

Act 689 of 2023...................................................................................... 8, 13

Act 900 of 2025 ............................................................................... 8, 12, 44

Ark. Code Ann. § 4-88-1401 ................................................................*passim*

Ark. Code Ann. § 4-88-1402 ................................................................*passim*

Ark. Code Ann. § 4-88-1403 ........................................................................ 9, 55

Ark. Code Ann. § 4-88-1404 ................................................................*passim*

Ark. Code Ann. § 5-27-306 .........................................................................44

Fed. R. Civ. P. 59 ........................................................................................... 1

**Other Authorities**

A. Przybylski & V. Nash, *Internet Filtering and Adolescent Exposure to Online Sexual Material*, Cyberpsychology, Behavior, and Social Networking (July 1, 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6101267/ ...................................39

*Age 13 rule isn't working—Most pre-teens already deep in social media*, MSN, https://www.msn.com/en-us/news/technology/age-13-rule-isn-t-working-most-pre-teens-already-deep-in-social-media/ar-BB1rmP6K?ocid=entnewsntp&pc=u531&cvid=800350cb5c6146ba8042bea14b2789c1&ei=10;................................................ 41

*Fact Sheet: Biden-Harris Administration Announces Actions to Protect Youth Mental Health, Safety & Privacy Online*, White House (May 23, 2023), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/05/23/fact-sheet-biden-harris-administration-announces-actions-to-protect-youth-mental-health-safety-privacy-online/ ......................................................................7

*FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes*, FBI Nat'l Press Off. (Dec. 19, 2022), https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes ............................6

*House Vote*, Ark. State Legislature, https://tinyurl.com/294kpzsp ........................8

J. Jargon, Apple Admits to Bug in Screen Time Parental Controls (July 29, 2023), https://www.wsj.com/tech/personal-tech/apples-parental-controls-are-broken-55a2aa52?mod=article_inline.............................42

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ....................................................................................................54

M. Allen, *Sean Parker unloads on Facebook*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792....................................................................................................3

*Meta's Resp. for Senate Judiciary Hearing* 6 (Apr. 19, 2024), https://www.judiciary.senate.gov/imo/media/doc/2024-01-31_-_qfr_responses_-_zuckerberg1.pdf ................................................22

Op. Ark. Att'y Gen. No. 32 (2025), https://ag-opinions.s3.amazonaws.com/uploads/2025-032.pdf.......................................10

S. Captain, *Meet the Tumblr castaways trying to save its adult content from oblivion*, Fast Company (Dec. 8, 2018), https://tinyurl.com/25awcyw6........................................................................47

*Senate Vote*, Ark. State Legislature, https://tinyurl.com/mr3u6js3 .........................8

*Testimony of Tim Kendall*, House Committee on Energy and Commerce (Sept. 24, 2020), https://tinyurl.com/ykbrejnb..............................3

*Top 8 Ways Kids Can Bypass Parental Controls and How to Stop Them*
(Dec. 29, 2023), https://medium.com/@susan.larcom/top-8-
ways-kids-can-bypass-parental-controls-and-how-to-stop-them-
c7461ceb783a ................................................................................... 42

*Tumblr's NSFW ban is arousing a surge of sex-based social networks*,
Fast Company (Feb. 6, 2019),
https://www.fastcompany.com/90302918/tumblrs-nsfw-ban-is-
arousing-a-surge-of-sex-based-social-networks ................................. 47

U.S. Surgeon General's Advisory, *Social Media and Youth Mental
Health* (2023), https://www.hhs.gov/sites/default/files/sg-youth-
mental-health-social-media-advisory.pdf .................................... 2-4, 7

# Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. § 1331 and issued a final order and judgment on March 31, 2025. Add. 1; App. 353; R. Doc. 77. Defendant timely appealed on April 30, 2025. App. 394; R. Doc. 85. The district court then denied Defendant's motion to alter the judgment under Federal Rule of Civil Procedure 59(e) on July 23, 2025, Add. 43; App. 399; R. Doc. 97, which Defendant timely appealed on July 31, 2025, App. 403; R. Doc. 98. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

# Statement of Issues

**1.** Whether NetChoice has standing to bring a First Amendment claim on behalf of its members' users, including young children.

Apposite Authority: *Swanson v. Hilgers*, 151 F.4th 992 (8th Cir. 2025); *Hodak v. City of St. Peters*, 535 F.3d 899 (8th Cir. 2008); *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 294 (3d Cir. 2002) (Nygaard, J., dissenting).

**2.** Whether NetChoice proved the Social Media Safety Act violates the First Amendment rights of children and adults who want to access social media.

Apposite Authority: *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025); *Tik-Tok Inc. v. Garland*, 604 U.S. 56 (2025); *Comp. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11811, 2025 WL 3458571 (11th Cir. Nov. 25, 2025).

**3.**     Whether NetChoice proved the Social Media Safety Act is unconstitutionally vague.

Apposite Authority: *United States v. Williams*, 553 U.S. 285 (2008); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010); *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951 (8th Cir. 2019).

**4.**     Whether the district court issued an overbroad judgment that exceeded its authority.

Apposite Authority: *Trump v. CASA, Inc.*, 606 U.S. 831 (2025); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020); *Comp. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11811, 2025 WL 3458571 (11th Cir. Nov. 25, 2025).

## STATEMENT OF CASE

### A. Unrestricted social-media use harms children.

As a Surgeon General report found in 2023, social-media usage by children is both widespread and alarming. *See* App. 83; R. Doc. 42; R. Doc. 72, at 2 (citing report); U.S. Surgeon General's Advisory, *Social Media and Youth Mental Health* 4 (2023) ("*Surgeon Gen. Report*").[1] Even young children have been ensnared by social

---

[1] Available at https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

media, with "nearly 40% of children ages 8-12" reporting using it. *Surgeon Gen. Report* 4. And the numbers are even higher among older children. About 95% of children "ages 13-17 report using a social media platform, with more than a third saying they use social media 'almost constantly,'" many saying, "they feel 'addicted' to a social media platform," and over half of teenagers reporting that "it would be hard to give up social media." *Id.* at 4, 9–10. Their concerns about addiction are well-justified. "Push notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" are "features that maximize engagement," and some research has shown that people who use social media frequently "can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." *Id.* at 9. Indeed, there is evidence that social media was designed to be addictive, using "a social-validation feedback loop" to "exploit[] a vulnerability in human psychology" and "consume as much of your time and conscious attention as possible." M. Allen, *Sean Parker unloads on Facebook*, Axios (Nov. 9, 2017);[2] *see Testimony of Tim Kendall*, House Committee on Energy and Commerce (Sept. 24, 2020) ("[W]e sought to mine as much human attention as possible and turn into

[2] Available at https://www.axios.com/2017/12/15/sean-parker-unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

historically unprecedented profits. To do this, we didn't simply create something useful and fun. We took a page from Big Tobacco's playbook, working to make our offering addictive at the outset.").[3]

Given the "highly sensitive period of brain development," adolescents are especially susceptible to the potential harms of social-media use. *Surgeon Gen. Report* 5. Social-media use (at the average levels of use) dramatically increases adolescents' risk of depression and anxiety. *See id.* at 6 (explaining study showing that "adolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety"); *id.* at 7 (noting that 8th to 10th graders "spend an average of 3.5 hours per day on social media"). Other harms are also linked to social-media use, including "body image and disordered eating behaviors," "poor sleep quality," and "reduced sleep duration." *Id.* at 7, 10. And these harms can then lead to additional harms. For example, "[p]oor sleep has been linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors." *Id.* at 10.

---

[3] Printed statement available at https://tinyurl.com/ykbrejnb; video available at https://tinyurl.com/mhx75z88.

Social media is also "a significant contributor to sexual exploitation, abuse, and trafficking" of children.  App. 90.  It gives predators an opportunity to form relationships with children and increases the risk that children will be subject to sexploitation or cyberbullying.  App. 89–90.  Indeed, social-media platforms are being used to "promot[e] a vast network of pedophile accounts," which platforms are unable or unwilling to remove.  App. 301–02, 305–06; R. Doc. 62-1, at 1–2, 5–6.  For example, leaked Meta documents suggest that executives were giving its "integrity team" instructions to prioritize objectives, such as "reducing 'advertiser friction' and avoiding mistakes that might 'inadvertently limit well intended usage of our products'" over "traditional safety work focused on harmful content, such as child exploitation."  App. 303; R. Doc. 62-1, at 3.  And an independent consultant testified before a Senate subcommittee that Instagram knew alarming numbers of 13–15-year-old children were receiving unwanted sexual advances, yet the executive team decided to "do essentially nothing in response."  App. 328; R. Doc. 62-5, at 4, *see* App. 327; R. Doc. 62-5, at 3 (explaining that an Instagram research team initially discovered that 24.4% of 13–15-year-olds responded to surveys that they had received unwanted advances in the preceding seven days, but then "revised the survey results to state that the likely number" "was likely *only* 13 percent").  He described Instagram as "[a]n environment where unwanted sexual advances are normalized"

contrary to its "stated mission" "to provide a safe and supportive place." App. 328;
R. Doc. 62-5 at 4; *see* App. 334; R. Doc. 62-5, at 10 ("We would never tolerate routine
sexual advances to teens at our local supermarket. However, on Instagram, Meta,
and other social services at the moment, we completely tolerate that happening.").
He also criticized Meta for seeking to cover up the problem by stopping some of the
data collection about the harm it was causing. *See* App. 330; R. Doc. 62-5, at 6 (ex-
plaining that "[f]or Meta, a problem that is not measured is a problem that doesn't
exist" and that it had shut down or degraded the systems that Facebook had designed
to "measure[] important harms as well as methods to reduce those harms, for teens
and others").

The FBI also reports that they have seen "a horrific increase in reports of fi-
nancial sextortion schemes targeting minor boys," and that these schemes often oc-
cur on social-media platforms where children feel comfortable. *FBI and Partners Is-
sue National Public Safety Alert on Financial Sextortion Schemes*, FBI Nat'l Press Off.
(Dec. 19, 2022) ("*FBI Report*");[4] *see* App. 83; R. Doc. 42, at 5; R. Doc. 72, at 3 (citing
*FBI Report*). Although "online predators often use fake female accounts and target

---

[4] Available at https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes.

minor males between 14 to 17 years old" on social-media platforms, there are "victims as young as 10 years old." *FBI Report.*

Although social-media platforms often state that users must be over 13 to open an account or use their apps, *see* App. 409; R. Doc. 72-1, at 16:9-22; App. 475; R. Doc. 72-2, at 34:15-24; App. 510; R. Doc. 72-3, at 25:18-20, they largely rely on self-reporting, which allows younger children to evade the purported age restrictions, *see Surgeon Gen. Report* 4; App. 412; R. Doc. 72-1, at 27:19-28:18; App. 477; R. Doc. 72-2, at 45:13-18; App. 510–11; R. Doc. 72-3, at 25:25-26:13. For example, in just one three-month period, Facebook determined 600,000 accounts belonged to children younger than 13 and needed to be removed. App. 418; R. Doc. 72-1, at 50:21-51:10. And in addition to the risks of sexual exploitation, depression, anxiety, eating disorders, sleep deprivation, and addiction that these children will face on social-media platforms, their privacy is also threatened by the platforms' "excessive data collection." *Fact Sheet: Biden-Harris Administration Announces Actions to Protect Youth Mental Health, Safety & Privacy Online*, White House (May 23, 2023) ("*Fact Sheet*");[5] *see* App. 82; R. Doc. 42, at 4; R. Doc. 72, at 2 (citing *Fact Sheet*).

---

[5] Available at https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/05/23/fact-sheet-biden-harris-administration-announces-actions-to-protect-youth-mental-health-safety-privacy-online/.

### B. Arkansas enacted, and then amended, the Social Media Safety Act to protect children and empower parents.

To mitigate these harms, a bipartisan coalition of Arkansas legislators voted to pass the Social Media Safety Act in 2023.[6] The Social Media Safety Act (the "Act") prohibits social media companies from permitting "an Arkansas user who is a minor to be an account holder" on their "social media platform[s] unless the minor has the express consent of a parent or legal guardian." Ark. Code Ann. § 4-88-1402(a) (2023).[7] And it tells those companies how to comply with the prohibition: by "verify[ing] the age of an account holder" and "[i]f the account holder is a minor," confirming that the minor has parental consent "at the time an Arkansas user opens the account." *Id.* § 4-88-1402(b). The Act also specifies that companies must "use a third party vendor" and that acceptable, "[r]easonable age verification methods" include "a digital copy of a driver's license," "[g]overnment-issued identification," or "[a]ny commercially reasonable age verification method." *Id.* § 4-88-1402(c). And the Act prohibits third-party vendors from "retain[ing] any identifying

---

[6] *See House Vote*, Ark. State Legislature, https://tinyurl.com/294kpzsp; *Senate Vote*, Ark. State Legislature, https://tinyurl.com/mr3u6js3.

[7] Act 689 of 2023 created the Social Media Safety Act, which has been amended by Act 900 of 2025. *See* Act 689 of 2023, https://tinyurl.com/4u2jv582; Act 900 of 2025, https://tinyurl.com/bfbmd9m2. The brief will generally cite to the provisions of the Arkansas Code where the Social Media Safety Act has been codified.

information of an individual" to protect privacy. *Id.* § 4-88-1404(a).

To encourage compliance, the Act imposes penalties for violations. If a social media company "knowingly" violates the Act and "fails to perform a reasonable age verification," then that company can be held liable by prosecutors, the Attorney General, or the harmed individuals. *Id.* § 4-88-1403(a)–(c). And if the commercial entity "knowingly retain[s] identifying information of an individual" after the age verification is performed, that entity "is liable to the individual for damages resulting from the retention of the identifying information." *Id.* § 4-88-1404(b).

In 2023, the Act defined "social media company" as "an online forum that a company makes available for an account holder to" (1) create a profile or account "for the primary purpose of interacting socially with other profiles and accounts," (2) "[u]pload or create posts or content," (3) "[v]iew posts or content of other account holders," and (4) "[i]nteract with other account holders or users, including … through request and acceptance." *Id.* § 4-88-1401(7)(A)(2023). It expressly excluded certain types of companies from the definition, including companies that offer "subscription content in which users follow or subscribe unilaterally and whose platform's primary purpose is not social interaction," "interacting gaming," certain services "for kindergarten through grade twelve (K-12) schools," and "career development opportunities, including professional networking." *Id.* § 4-

88-1401(7)(B)(i)–(iv). The Act also provided a definition of a social media platform as a "service or application" that "has users in Arkansas" and has "a substantial function" of connecting users so they can "interact socially with each other within the service or application." *Id.* § 4-88-1401(8)(A). And the Act excluded from the definition certain services or applications "if the predominant or exclusive function" is of a certain type, including "[e]mail," "[d]irect messaging," streaming of "only licensed media in a continuous flow from the service … to the direct user," and others. *Id.* § 4-88-1401(8)(B). So the age-verification and parental-consent requirement applied to Arkansans who wanted to open a Facebook account, for example, but not to those who wanted to open a Snapchat account.

In 2025, the Arkansas Legislature amended the Social Media Safety Act to further protect children and empower parents. Among other changes, it revised definitions, and the definitional changes became effective on August 5, 2025. Op. Ark. Att'y Gen. No. 32 (2025).[8] The definition of "[s]ocial media platform" was expanded to be "a business entity or organization that operates an online platform, application, or service" that has six characteristics, including that it is "designed to facilitate user-to-user, user-to-group, or user-to-public interaction," "[p]rovides

---

[8] Available at https://ag-opinions.s3.amazonaws.com/uploads/2025-032.pdf.

mechanisms for a user to create an online profile comprised of personally identifiable information," "[e]mploys features that allow a user to connect, follow, or establish a relationship with other users," and "[g]enerates revenue primarily through user engagement." *Id.* § 4-88-1401(11)(A) (2025). The definition excludes "an email service provider, a not-for-profit organization, a public or private school, business-to-business software, a common carrier, or a broadband internet service." *Id.* § 4-88-1401(11)(B). The amendments also changed "minor" to mean children under 16, *id.* § 4-88-1401(11)(A), rather than individuals under 18, *id.* § 4-88-1401(5) (2023). And the amendments also tweaked the definition of account holder. Originally, account holder was defined as someone "who creates an account or a profile to use a social media platform," *id.* § 4-88-1401(1). But recognizing that children could enlist the help of an older individual to help them create an account, the Act was expanded to encompass those who "otherwise control[] an account or a profile to use a social media platform." *Id.* § 4-88-1401(1) (2025).

In addition, the Legislature amended the Act to impose new requirements on social-media platforms to better protect minors that have parental permission to create accounts. For example, social-media platforms will be required to "[e]nsure that, by default," minors do not receive notifications ("other than safety or privacy-related alerts") between 10 p.m. and six a.m., that minors have "the most protective"

privacy and safety settings offered by the platform, and that parents have access to an "online dashboard" that helps them to understand their child's use of the social-media platform and restrict access to it. Act 900, § 2 (to be codified at Ark. Code Ann. § 4-88-1402(d)(2), (4)). To allow ample time for compliance, these new requirements, along with others, will become effective on April 21, 2026. Act 900, § 8.

### C. NetChoice challenged the Act, and the district court purported to enjoin the Act.

Before the 2025 amendments, a trade association, NetChoice LLC, the Attorney General alleging that Arkansas's Social Media Safety Act was unconstitutional. Add. 3; App. 355; R. Doc. 77, at 3. Specifically, NetChoice argued that the original Act violated the First Amendment rights of users on its members' platforms and violated the due process rights of its members. *See* Add. 19, 34; App. 371; R. Doc. 77, at 19, 34.

The district court granted summary judgment for NetChoice. Based on the 2023 definitions, the district court concluded the Act was subject to "strict scrutiny" because it drew content-based distinctions (such as by excluding companies that "provide[] career development opportunities") and speaker-based distinctions (such as by "privileg[ing] institutional content creators" like "traditional journalists" over users of online services like a TikTok chef). *See* Add. 22–24; App. 374–76; R. Doc. 77, at 22–24. And the court concluded that the Act could not survive

strict scrutiny. It reasoned that the Act was not narrowly tailored because some platforms that harm minors, such as Snapchat and YouTube, fell outside the definition of social media. *See* Add. 26–29; App. 378–81; R. Doc. 77, at 26–29. It also found the Act "overinclusive," reasoning that "Arkansas's imposition of an age-verification requirement for account creation is maximally burdensome." Add. 30; App. 382; R. Doc. 77, at 30. Turning to the due process claim, the district court concluded the Act was vague "because it fail[ed] to adequately define which entities are subject to its requirements, risking chilling effects and inviting arbitrary enforcement." Add. 36; App. 388; R. Doc. 77, at 36.

After concluding the Act was an unconstitutional "content-based restriction on speech" and "unconstitutionally vague," the district court purported to permanently enjoin the 2023 Act itself, rather than the Attorney General's enforcement of it. Add. 33, 36, 41; App. 385, 388, 393; R. Doc. 77, at 33, 36, 41.[9]

### D. The district court denied the motion to alter the judgment to reflect the limits on its authority.

Noting that "an injunction cannot operate against the statute itself but must be directed only at the actions of a defendant tasked with executing it" and that

---

[9] The judgment, however, directs the permanent injunction towards the Attorney General, prohibiting him from enforcing Act 689 in its entirety. Add. 42; App. 394; R. Doc. 78, at 1.

injunctive relief must be tailored to remedy the harm NetChoice had shown, the Attorney General filed a motion to alter or amend the judgment. R. Doc. 83, at 5; *see* App. 395; R. Doc. 82, at 1. He argued that the injunction was overbroad and exceeded the district court's authority, including because an injunction cannot be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." R. Doc. 83, at 5 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). He also noted the injunction was overbroad because he "does not enforce the entire Act, NetChoice does not have standing to challenge the entire Act, and NetChoice did not assert arguments challenging each of the Act's provisions." *Id.* at 1. The Attorney General also argued that the district court should alter the judgment due to the amendments to the Social Media Safety Act, some of which were set to go into effect soon. *Id.* at 8. He argued that the amendments underscores the judgment's flaws, including that it enjoins him from initiating enforcement actions for violations of § 4-88-1402 even though that provision had been amended. *Id.* at 8.

Recharacterizing the Attorney General's arguments regarding the constitutional and equitable limits on a district court's authority to issue an injunction as severability arguments, the district court denied the motion. Add. 43–44; App. 399–400; R. Doc. 97, at 1–2. It concluded that severability arguments were forfeited and failed on the merits. Add. 45; App. 401; R. Doc. 97, at 3.

## E. Amendments to the Act became effective pending appeal, raising questions about mootness and this Court's review.

While this appeal was pending, some of the amendments to the Social Media Safety Act became effective—including changes to the definitions that the district court had found unconstitutionally vague. The Attorney General accordingly filed a motion to dismiss the appeal as moot and to vacate the district court's judgment given the intervening change in law. *See* Defs.' MTD 1. In the alternative, the Attorney General requested that the Court "review the district court's judgment in light of current law" to avoid issuing an "impermissible advisory opinion" and that the Court inform the parties of its intent to do so, which would allow "the parties to tailor their briefs accordingly." *Id.* at 1, 19–20.

NetChoice disagreed that the amendments were sufficient to moot the appeal; however, it agreed that this Court "must review the challenged state law as it now exists, not as the law existed at the time of the district court's judgment." MTD Opp. 1. The Court ordered that the motion be "taken with the case." Oct. 2, 2025 Order.

## SUMMARY OF THE ARGUMENT

As a threshold matter, NetChoice's First Amendment claim fails because NetChoice lacks standing to assert it. Rather than claim its *own* rights were violated or even the rights of *its* members, NetChoice brought a First Amendment claim

based on the rights of its *members' users*—including the rights of children. The Court should reject NetChoice's attempt to stack associational standing and third-party standing in this fashion. Not only did NetChoice fail to show the requisite closeness between itself and its members' users and fail to show that users are unable to assert their own rights, but NetChoice also cannot overcome the conflict of interest that exists between it and its members' users, who its members have every incentive to exploit for their own profit.

If the Court reaches the merits of the First Amendment claim, NetChoice loses there too. The Act regulates conduct—primarily, by requiring that social-media platforms verify age and, in some cases confirm that a child has parental consent, before allowing a person to open an account. And even assuming that the Act regulates expressive conduct, the Act is content neutral and would be subject to intermediate scrutiny at most, which it easily satisfies. For starters, not even the district court disputes that the State has a compelling interest in protecting children from the harms of social media, and the State's interest in parental rights and giving parents the necessary tools to protect their children is equally compelling. And the Act advances these compelling interests without "burden[ing] substantially more speech than necessary." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) ("*Turner II*")). In fact, the

Act is narrowly tailored to advancing the State's compelling interests, so it survives strict-scrutiny review too.

In any event, NetChoice's First Amendment claim fails because it is a facial claim, yet NetChoice failed to prove that the Act's unconstitutional applications are "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). Indeed, it tried to evade its burden instead. Rather than fully develop the factual record, such as offering evidence about how the Act would apply to the host of social-media platforms (or even just how the Act would apply to all of its *own* members) and how the Act would impact users' ability to transmit or receive protected speech on those platforms, NetChoice insisted "additional discovery was not needed" because they brought a facial challenge. App. 341; R. Doc. 64, at 2. But "[t]he need for NetChoice to carry its burden" "is the price of its decision" to bring a facial challenge, *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). And its failure to do so is fatal to its First Amendment claim.

NetChoice's vagueness claim fares no better. All parties agreed that "Facebook and Instagram will be subject to [the Act]" under the Act's original definitions, App. 136; R. Doc. 54-2, at 19, yet NetChoice still insisted the Act was unconstitutionally vague because its definitions used undefined terms and qualitative standards. But "perfect clarity and precise guidance" are not "required even of regulations that

restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). And the original Act's terms gave fair notice of what entities it regulated and sufficient guidance for its enforcement. So do the Act's amended terms. Indeed, NetChoice fails to identify a single member that is uncertain about whether the Act applies to them now and simply asserts that some of the Act's terms are vague. MTD Opp. 17. Such conclusory assertions are insufficient for NetChoice to carry its burden of proving it is entitled to judgment as a matter of law on its vagueness claim. The district court's judgment should therefore be reversed across the board.

In the alternative, even if this Court rules for NetChoice on the merits, it should narrow the scope of the relief granted. The district court overstepped its authority by granting overbroad, universal injunctive relief and by not tailoring the relief to remedy the actual harm shown. Therefore, "the district court's injunction would require modification, at the very least." *Comp. & Commn'cns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *10 n. 13 (11th Cir. Nov. 25, 2025) ("*CCIA*").

**ARGUMENT**

## I.   STANDARD OF REVIEW

This Court reviews a "decision to grant summary judgment de novo." *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1108 (8th Cir. 2020). And it will only "affirm a

district court's grant of summary judgment" if the record "demonstrate[s] that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1064 (8th Cir. 2004) (citation modified).

Where the challenged law has been amended since the district court's judgment, the Court reviews the law "as it now exists, not as the law existed at the time of the district court's judgment." *Id.*; *see Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1548 (8th Cir. 1996) (same). If the Court cannot resolve the question of the law's constitutionality "on the current record," it "will remand the case to the district court for further consideration." *Smithfield Foods*, 367 F.3d at 1064.

## II. NETCHOICE LACKS STANDING TO ASSERT A FIRST AMENDMENT CLAIM BASED ON THE RIGHTS OF ITS MEMBERS' USERS.

Even though NetChoice's First Amendment claim "is based on the First Amendment right of users, not platforms," the district court concluded that NetChoice had standing to assert that claim. Add. 17; App. 369; R. Doc. 77, at 17. This was error. NetChoice cannot assert the constitutional interests of its members' users, much less potential future account holders. And it certainly cannot assert the constitutional interests of Arkansas children and override the rights of their parents

who seek to protect them from NetChoice members' dangerous products and services.

In assessing the viability of the "limited" third-party standing exception, courts assess (1) "whether the party asserting the right has a close relationship with the person who possesses the right," and (2) "whether there is a hindrance to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quotations omitted). The potential for a future relationship with the third party is insufficient to establish the requisite closeness. *See Swanson v. Hilgers*, 151 F.4th 992, 996 (8th Cir. 2025) ("While '*existing*' relationships may be sufficient to confer third-party standing, '*hypothetical*' relationships with unknown claimants are not." (quoting *Kowalski*, 543 U.S. at 131)). And a plaintiff necessarily cannot show a hindrance when third parties are asserting their own rights. *See Hodak v. City of St. Peters*, 535 F.3d 899, 905 (8th Cir. 2008). Moreover, third-party standing is not viable when plaintiffs and third parties have conflicting interests that would interfere with the plaintiffs' ability to be "effective proponents" of the third parties' rights. *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1016 (8th Cir. 1983); *see, e.g.*, *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 402 (2020) (Alito, J., dissenting) (explaining that the Court has "held that third-party standing is not appropriate where there is a potential conflict of interest between the plaintiff

and the third party" and noting that *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004), "recognized the seriousness of conflicts of interest in the specific context of third-party claims")), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

NetChoice failed to meet either prong here. As a preliminary matter, there is not a sufficiently close relationship even between NetChoice *members* and users of their platforms, much less potential future account holders, to support third-party standing. Members have "no relationship at all" with hypothetical future users, *Kowalski*, 543 U.S. at 131, and no *close* relationship with current users that resembles attorney-client or abortion provider-patient relationships that have been found sufficiently close, *see id.* at 130; *June Med.*, 591 U.S. at 318; *but see Dobbs*, 597 U.S. at 287 n.61 (listing *June Medical* as a case that has "ignored the Court's third-party standing doctrine"). And any relationship that could support third-party standing is undermined by social-media companies' decisions to prioritize maximizing profits, rather than child safety or user well-being. *See supra* 2–7. Moreover, there are conflicts of interest between NetChoice members and users that preclude members from being "effective proponents" of users' rights. *Gold Cross Ambulance*, 705 F.2d at 1016. For example, at least some of NetChoice members support age-verification and parental consent requirements before children under 16 can download their application

(at least when the app stores bear the costs),[10] and several members already have a 13-years-old-and-over policy. *See supra* 7. They therefore likely have different positions about the scope of children's rights or what type of age-verification and parental-consent would be constitutionally permissible than those children would, which shows their interests are not "properly aligned." *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994). To take another example, how does challenging a provision that allows users to seek damages if they are harmed by a company's retention of their identifying information (Ark. Code Ann. § 4-88-1404) help users? It doesn't, which further demonstrates that the interests of members and users are not properly aligned. *See In re Gee*, 941 F.3d 153, 165 (5th Cir. 2019) (per curiam) (explaining that, even assuming abortion providers had third-party standing, that does not mean "they have standing to challenge laws that help women").

To top it off, NetChoice—not its members—is seeking to assert members' users' rights, attenuating the relationship between the litigant and the third parties even further. NetChoice cannot gain standing to assert users' First Amendment rights by combining associational standing and third-party standing in this fashion to

---

[10] *See Meta's Resp. for Senate Judiciary Hearing* 6 (Apr. 19, 2024), https://www.judiciary.senate.gov/imo/media/doc/2024-01-31_-_qfr_responses_-_zuckerberg1.pdf (supporting "federal legislation that requires app stores to get parents' approval whenever their teens under 16 download apps," "including ours").

create "a hybrid-type of third-party derivative standing." *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 294 (3d Cir. 2002) (Nygaard, J., dissenting); *see id.* (explaining plaintiff could not cite "any authority for stacking or piggy-backing these relationships into an attenuated concatenation of exceptions to the standing rule"). Associational standing is already on shaky constitutional grounds. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring) ("Associational standing raises constitutional concerns by relaxing both the injury and redressability requirements for Article III standing."); *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1168–69 (D.C. Cir. 2025) (Henderson, J., concurring) (explaining how "associational standing has no well-rooted historical pedigree" and creates Article III problems). So this Court should certainly not extend it any further. *See Hester v. United States*, 586 U.S. 1104, 1105 (2019) (Alito, J., concurring in denial of certiorari) ("[F]idelity to original meaning counsels against further extension of these suspect precedents."); *see also Rhodes v. Michigan*, 10 F.4th 665, 692 (6th Cir. 2021) (Thapar, J., dissenting in part). It should instead hold that "NetChoice cannot assert third-party interests separate from its members" and that "if internet users believe that the age-verification requirement will burden their speech, they must raise their own [First Amendment] challenge." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1018 (9th Cir. 2025).

In any event, NetChoice cannot meet the second prong because it has shown no hindrance to users' "ability to protect [their] own interests." *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016). Indeed, even children have sued to assert their First Amendment rights, including in suits challenging regulation of social-media websites. *See, e.g.*, *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 582 (W.D. Tex. 2025). So NetChoice necessarily cannot show that "some barrier or practical obstacle ... prevents or deters the third party from asserting [their] own interest[s]." *Hodak*, 535 F.3d at 904. The district court therefore erred by granting NetChoice summary judgment on the First Amendment claim that it lacked standing to assert.

## III. THE SOCIAL MEDIA SAFETY ACT IS CONSISTENT WITH THE FIRST AMENDMENT.

Even assuming NetChoice has standing, it has failed to prove that the Act violates the First Amendment—much less that the Act's unconstitutional applications disproportionately outweigh its lawful ones to prevail on its facial challenge. And NetChoice's failure is even more apparent given the 2025 amendments. The Court should therefore reverse the summary judgment.

### A. At most, intermediate scrutiny applies to the Act.

As a threshold matter, the district court applied the wrong standard of review. Because the district court concluded the Act was a content-based regulation of

speech that discriminates based on speaker, it concluded strict scrutiny applies. But the Act regulates conduct not speech and, to the extent it regulates expressive conduct, the Act is content-neutral, making intermediate scrutiny appropriate.

### 1. *The Act regulates conduct, not speech.*

NetChoice argued that the Act burdens First Amendment rights by mandating that social-media companies comply with age-verification and parental-consent requirements before allowing someone to become an account holder on their social-media platform and gain access to all their online services. App. 350; R. Doc. 66, at 1; R. Doc. 67, at 10, 12–17. But the Act does not regulate speech at all; it instead regulates conduct. This is apparent whether the Court views the requirements as imposing conditions on social-media companies' ability to contract with children or an incidental burden on the ability to access a product or location that poses serious dangers for children. And "the First Amendment 'does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.'" *Brandt v. Griffin*, 147 F.4th 867, 888 (8th Cir. 2025) (en banc) (quoting *NIFLA v. Beccera*, 585 U.S. 755, 79 (2018)).

A preliminary question in First Amendment cases is often whether a statute "regulates speech, conduct, or both," and Supreme Court precedents have "long drawn that line." *Id.* Courts look to whether the regulation "regulates conduct,"

what persons or organizations "must *do*," or whether it regulates "what they may or may not *say*." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006); *see Lichtenstein v. Hargett*, 83 F.4th 575, 579 (6th Cir. 2023) (concluding a prohibition on "distributing a government form" "qualifies as conduct, not speech"). Then "[t]o decide whether conduct is sufficiently imbued with communicative elements to be protected, courts ask whether an intent to convey a particularized message was present and whether the likelihood was great that the message would be understood by those who viewed it." *Redlich v. City of St. Louis*, 51 F.4th 283, 287 (8th Cir. 2022) (citation modified). In other words, whether the regulated conduct is "inherently expressive." *Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1394 (8th Cir. 2022) (en banc).

Applying these principles here, the Act regulates conduct that is not inherently expressive. The Act "affects what [social-media companies] must *do*"—verify the age and, at times, verify parental consent before allowing an Arkansan to control an account or profile—"not what [social-media companies or users] may or may not *say*." *Rumsfeld*, 547 U.S. at 60. By prohibiting companies from allowing an Arkansan "who is a minor to be an account holder" on their platform without "the express consent of a parent or legal guardian," Ark. Code Ann. § 4-88-1402(a), the Act regulates companies' ability to contract with children. That is commercial activity, not

speech, which is evidenced by the fact that a person must consent to "terms of service," including agreeing to limit the company's liability to have an account on a platform like Facebook or Instagram. *See* App. 409; R. Doc. 72-1, at 16:9-17:5, App. 413–15; 32:24-38:12. And that conduct is not "inherently expressive," even if some people may intend "to express an idea" though their decision to have an account or not, *Redlich*, 51 F.4th at 287, because that idea can only be understood "by the speech that accompanies" their decision, *Rumsfeld*, 547 U.S. at 66.

Furthermore, restrictions on contracts, especially contracts with children who have "peculiar vulnerability" and different constitutional rights than adults, *Bellotti v. Baird*, 443 U.S. 622, 634 (1979), have a well-established historical pedigree. *See J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011) (recognizing that the "law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment" and "[l]egal disqualifications on children as a class," including their inability to enter contracts); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (en banc) (discussing how contracts with children were often not permissible and that children do not have the same legal rights as adults); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 832–33 (Thomas, J., dissenting) (explaining that parents historically had authority to contract his child's labor and services out to others). Yet they have "coexisted with the First

Amendment" without "a cause for constitutional concern." *Vidal v. Elster*, 602 U.S. 286, 295–96 (2024).

Moreover, the age-verification and parental-consent requirement limit Arkansans' ability to access content on the platforms and platforms' services only because social-media companies have required people to have accounts to get access to the entirety of the content and services, so that they can maximize revenue from targeted advertisements. *See* App. 410, 419; R. Doc. 72-1, at 18:3-19, 55:24-57:16. Accordingly, there are "causal steps between the regulations and the alleged burden on protected speech"—the platforms' business practices—which further weigh against applying First Amendment scrutiny. *TikTok Inc. v. Garland*, 604 U.S. 56, 69 (2025). And the Act notably does not "foreclose access to social media altogether" for anyone. *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). Minors can see what the platforms or its users choose to make available to non-accountholders, such as public Facebook pages and posts and YouTube videos. And adults can likewise see what is made available to non-accountholders and can open accounts.

In any event, even if the Act is not construed as a restriction on contracting with children, it still regulates only non-expressive conduct—platforms allowing children to access a location or product that is dangerous to them in contravention of their parents' right to protect them. *See supra* 2–7; *see also Lemmon v. Snap, Inc.*,

995 F.3d 1085, 1088–90 (9th Cir. 2021) (describing allegations that a Snapchat's "Speed Filter" feature was "incentivizing young drivers to drive at dangerous speeds" and led to the death of three children and multiple accidents). It is thus similar to laws barring children from accessing bars, even though protected speech occurs in bars, or getting a tattoo without parental consent, even though tattooing has been recognized as "protected artistic expression." *Buehrle v. City of Key West*, 813 F.3d 973, 975 (11th Cir. 2015). The target is the conduct, not protected expression, so the Act is a regulation of non-expressive conduct that does not "implicate[] the First Amendment." *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (concluding that a trespass policy has nothing "to do with the First Amendment" and that "[p]unishing its violation by a person who wishes to engage in free speech" is punishing "nonexpressive *conduct*"); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002) (explaining a prohibition on "nude dancing in alcohol-licensed establishments" "does not restrict [plaintiff's] right to observe or engage in nude dancing" as plaintiff is free to do so elsewhere); *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 726 (7th Cir. 2003) (similar). After all, "[t]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 918 (8th Cir. 2017) (quoting *Heffron v. Int'l Soc. for Krishna*

*Consciousness, Inc.*, 452 U.S. 640, 647 (1981)); *see Lichtenstein*, 83 F.4th at 587 (that a law may "reduce[] [a plaintiff's] ability to spotlight" his views does not "transform" "conduct into speech subject to strict scrutiny").

*Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013), bears this out. The City had an ordinance that prohibited "persons under the age of 21 from entering or remaining in certain alcoholic establishments while alcohol is being served or sold," unless exemptions applied such as the person being "accompanied by a parent." *Id.* at 1297–98. A bar that frequently hosted "political events and activities," a 19-year-old patron who was cited for entering the bar to sign a petition "requesting an ethics investigation" of the mayor, and an over-21-year-old patron who wanted "to engage in political speech … around individuals under the age of 21" argued that the ordinance violated the First Amendment. *Id.* at 1297, 1299. The Eleventh Circuit rejected the argument, concluding that the ordinance "does not regulate speech" but conduct: "the admittance of underage individuals into alcoholic beverage establishments." *Id.* at 1300. And it reasoned that ordinance "does not infringe on [the plaintiffs'] in the first instance" because their "right to engage in expressive conduct has not been infringed." *Id.* The same is true here. The age-verification and parental-consent requirements are targeted towards the conduct of allowing children unrestricted access to products that pose serious dangers to them

and disregarding parental rights, not expression that happens to occur on social-media platforms.

### 2. Even if the Act burdens or regulates speech or expressive conduct, intermediate scrutiny applies.

Regardless, even assuming the Act burdens or regulates expressive conduct or speech, strict scrutiny is not the proper standard—intermediate scrutiny is.

When a statute imposes "an incidental burden on First Amendment expression," such as a "prohibition on destroying draft cards" or an age-verification requirement to access materials that are obscene to minors, the statute is "subject to intermediate scrutiny." *Paxton*, 606 U.S. at 483 (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)). And even when a statute imposes "restrictions on protected speech," intermediate scrutiny applies if the statute is content neutral. *Id.* at 471. That is because "[c]ontent-neutral laws" will generally "pose a less substantial risk of excising certain ideas from the public dialogue." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("*Turner I*"). In contrast, "'[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny" in most circumstances. *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *see Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007) (identifying situations where "strict scrutiny is unwarranted" despite content discrimination).

The Act does not regulate speech or expression based on "communicative content." *Paxton*, 606 U.S. at 471. To the contrary, assuming the Act regulates speech or expression, it "defines social media platforms by reference to a *form* of expression, not a *subject matter*," *CCIA*, 2025 WL 3458571, at *4, or to put it another way, the Act essentially turns not "on *what* a publication says," but rather "*where* [the expression] [i]s printed," *Hershey v. Jasinski*, 86 F.4th 1224, 1233 (8th Cir. 2023). And "[t]o the extent [the Act] burdens adults' right to access" speech on social media, "it has only an incidental effect on protected speech, making it subject to intermediate scrutiny." *Paxton*, 606 U.S. at 478 (citation modified). The district court concluded otherwise, reasoning that the Act is subject to strict scrutiny because it imposes "significant burdens on adult access" with its age-verification requirement and that the Act's original definitions meant the Act was "draw[ing] both content-based and speaker-based distinctions." Add. 20, 24; App. 372, 376; R. Doc. 77, at 20, 24. It is wrong on both fronts.

*First,* age-verification requirements are "ordinary and appropriate means of enforcing an age limit, as is evident both from all other contexts where the law draws lines based on age and from the long, widespread, and unchallenged practice of requiring age verification for in-person sales of material that is obscene to minors." *Paxton*, 606 U.S. at 493; *see id.* at 479 (collecting examples of age-verification

requirements).  And the Act's age-verification requirements certainly do not impose a substantial burden based on any potential chilling effect here when the Supreme Court has rejected similar arguments in the context of age-verification requirements to access pornography where there are heightened privacy concerns and potential for "social stigma" and "embarrassment." *Id.* at 499.  Furthermore, the Act requires platforms to use third parties for age verification, Ark. Code Ann. § 4-88-1402(c)(1), and the age-verification requirement can be implemented while preserving anonymity and not sharing identity details with the platforms, *see, e.g.*, App. 66–67; R. Doc. 34-1, at 16–18.

*Second*, the district court is wrong that the original definitions regulated platforms based on the communicative content of the messages on their platforms as opposed to the platforms' nature as "online forum[s] that a company makes available for an account holder" to create a profile or account "for the primary purpose of interacting socially with other profiles and accounts."  Ark. Code Ann. § 4-88-1401(7)(A)(i) (2023).  That some "examination of speech"—"who is the speaker and what is the speaker saying"—was necessary to determine whether an entity was subject to the Act's regulations is insufficient to render the original Act a content-based regulation.  *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022).  And the district court was mistaken to think that characterizing

the Act as a speaker-based distinction was the end of the inquiry rather than the beginning. *See Turner I*, 512 U.S. at 653 ("To the extent appellants' argument rests on the view that all regulations distinguishing between speakers warrant strict scrutiny, it is mistaken."); *Josephine Havalak*, 864 F.3d at 915 ("Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry."). The Act did not reflect a content preference, so "heightened scrutiny is unwarranted" even with its earlier speaker-based distinction. *Turner I*, 512 U.S. at 660.

In any event, the Act's current definitions do not draw content-based or speaker-based distinctions, making heightened scrutiny "unwarranted." *Id.* As explained, even if the Act regulates speech or expression, it "defines social media platforms by reference to a *form* of expression, not a *subject matter*," *CCIA*, 2025 WL 3458571, at *4, so its definition does not turn on the communicative content on social media platforms at all, *see* Ark. Code Ann. § 4-88-1401(A) (2025) (an entity "that operates an online platform, application, or service" that "[i]s designed to facilitate user-to-user, user-to-group, or user-to-public interaction," uses "a unique identifier, username, profile name, or image that is associated with a specific user account," allows "a user to create an online profile comprised of personally identifiable information," uses "features that allow a user to connect, follow, or establish a relationship with other users and creates a network of interactions," "[g]enerates

revenue primarily through user engagement, including" with advertisements, and "is accessed by Arkansas users"). And the exclusion of email providers, non-profits, schools, "business-to-business software, a common carrier, or broadband interest service" likewise does not draw lines based on communicative content. *Id.* § 4-88-1401(11)(B).

Like the similar Florida law, the Act's definitions do not "make[] any reference to the type of content involved," so it is "facially content neutral." *Computer & Commc'ns Industry Ass'n*, 2025 WL 3458571, at *4. And as a content "agnostic" law that applies regardless of the content of the posts on a platform, the Act "is content neutral and does not warrant the application of strict scrutiny," unless it has "a content-based purpose or justification." *Reagan Nat'l Advert.*, 596 U.S. at 69. And NetChoice has failed to show the Act has such a purpose.

Nor can it. Because the Act's purpose is not to burden content, but to protect children from the dangers of unrestricted social-media access and to give parents tools to protect their children from the harms attendant to social media. Perhaps NetChoice will claim that Act is content based because it may disproportionately impact certain speakers or messages. But even if that were true that would not change the fact that, as a law "unrelated to the content of expression," the Act would still be "neutral." *Josephine Havlak*, 864 F.3d at 915.

Furthermore, the Act applies neutrally to speakers that use the platforms; it does not "privilege[] institutional content creators."  Add. 24; App. 376; R. Doc. 77, at 24.  After all, *everyone* who uses social-media accounts to interact with other account holders, both "the citizen journalist" and "institutional content creators," *id.*, may have reduced engagement with their social-media accounts if the Act causes fewer adults and children to open social-media accounts, *see CCIA*, 2025 WL 3458571, at *6 n.7 (noting that "if Disney+ uploads its content to one of [plaintiffs'] members 'platforms,' as defined by the statute, that content will also be inaccessible to young children via their own accounts" under a similar law).

To be sure, the Act imposes age-verification and parental-consent require-ments to open a social-media account (*e.g.*, Facebook account) but not to open other non-social media accounts (*e.g.*, a subscription account with *The Washington Post*). But even if that is considered a speaker-based distinction, that distinction is permis-sible because it is "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry."  *Turner I*, 512 U.S. at 645.  There is no "preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."  *Id.* at 658.  Further-more, social-media platforms have "special characteristics" that justify being regu-lated differently.  *TikTok*, 604 U.S. at 73.  Indeed, social media involves "new

technologies with transformative capabilities," *id.* at 62, and "pose dangers not seen earlier," *Moody*, 603 U.S. at 733. The Act's focus on this "one medium (or a subset thereof)" therefore does not "mandate[] strict scrutiny," *Turner I*, 512 U.S. at 660.

In short, the Act is facially content-neutral, has a content-neutral purpose, and draws lines that are not a surrogate for content discrimination. It is thus subject to only intermediate scrutiny.

## B. The Act survives any level of scrutiny.

The Act easily survives intermediate scrutiny; however, it can survive strict scrutiny too. Whereas strict scrutiny requires the government to prove that laws "are narrowly tailored to serve compelling state interests," *TikTok*, 604 U.S. at 70 (quoting *Reed*, 576 U.S. at 163), "a law will survive [intermediate scrutiny] 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests,'" *Paxton*, 606 U.S. at 471 (quoting *Turner II*, 520 U.S. at 189). Under intermediate scrutiny, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *TikTok*, 604 U.S. at 76 (quoting *Turner I*, 512 U.S. at 662). Courts instead give the Government "latitude" "to design regulatory solutions to address content-neutral interests," *id.* at 77 (quoting *Turner II*, 520 U.S. at 213), and are "loath to second-guess the Government's judgment," *Bd. of Trs. of*

*State Univ. of New York v. Fox*, 492 U.S. 469, 478 (1989). Accordingly, a law's validity "does not turn on whether [courts] agree with the Government's conclusion that its chosen regulatory path is best or 'most appropriate.'" *TikTok*, 604 U.S. at 78 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

Here, the State's interests are not only important, but also compelling—protecting children and empowering parents to do so. States have a compelling interest in protecting "the physical and psychological well-being of a minor," *Maryland v. Craig*, 497 U.S. 836, 852–53 (1990) (collecting cases); *see Schall v. Martin*, 467 U.S. 253, 263 (1984) (recognizing "[t]he State has a parens patriae interest in preserving and promoting the welfare of the child" (citation modified)); *Paxton*, 606 U.S. at 496 (concluding that a State's "interest in shielding children from sexual content is important, even 'compelling'"). Indeed, the State's interest in this regard is so "evident" that it is "beyond the need for elaboration." *New York v. Ferber*, 458 U.S. 747, 756 (1982); *see CCIA*, 2025 WL 3458571, at *6 (recognizing "[t]he State has a compelling interest in protecting minors in general" and that minors "are particularly susceptible to potentially addictive features built into some social media platforms"). As even the district court rightly acknowledged, "the reality, well supported by the record," is that "unfettered social media access can and does harm minors," and "the State 'has a compelling interest in protecting minor children.'" Add. 26; App.

378: R. Doc. 77, at 26 (quoting *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 897 (8th Cir. 2020)).

States have an equally compelling interest in supporting parents in their "discharge" of their responsibility "to direct the rearing of their children" and to protect their children. *Ginsberg v. State of New York*, 390 U.S. 629, 639 (1968); *see Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). Because parents have primary authority for the well-being of their children, States have a legitimate interest in empowering parents and "reinforc[ing] parental decisionmaking." *Brown*, 564 U.S. at 815 (Alito, J., concurring);[11] *see Schall v. Martin*, 467 U.S.

---

[11] The *Brown* majority questioned whether the challenged law was an appropriate means of assisting parental authority, but it also questioned what "parents of the restricted children actually want" and believed parents already had adequate tools to "evaluate the games their children bring home." *Id.* at 803–04. Here, a majority of adults and parents support "requiring parent consent for teens to create a social media account," App. 423; R. Doc. 72-1, at 73:1-22, and parents cannot prevent their children from creating social-media accounts given the ubiquity of smartphones and other devices that they can access, including school computers and friends' devices, *see Paxton*, 606 U.S. at 491, and the ineffectiveness of internet filters, *see* A. Przybylski & V. Nash, *Internet Filtering and Adolescent Exposure to Online Sexual Material*, Cyberpsychology, Behavior, and Social Networking 406 (July 1, 2018) ("*Internet Filtering*"), https://pmc.ncbi.nlm.nih.gov/articles/PMC6101267/. Regardless, the *Brown* Court applied strict scrutiny given that law's content-based nature, 564 U.S. at 799, whereas intermediate scrutiny, at most, is the proper standard here.

253, 265 (1984) (explaining that "if parental control falters, the State must play its part as parens patriae").

The Act is narrowly tailored to advance these compelling interests. Without the Act, young children are opening social-media accounts, suffering increased rates of depression, anxiety, sleep deprivation, and eating disorders, becoming targets of sexual predators, and developing addictions to social media. *See supra* 2–7. By requiring age verification and parental consent before minors can open accounts (and enter contracts with) social-media platforms, the Act helps protect children from the dangers of social media while empowering parents. Some parents will not provide consent, especially for younger children, which will protect them from the increased risks of depression, anxiety, eating disorders, addiction, and sexual exploitation. And if parents decide to provide consent after determining the benefits outweigh the risks for their particular children, *see* App. 125; R. Doc. 54-2, at ¶ 22, those parents will be able to review the terms of service to which they and their children are agreeing, will be able to better monitor for signs of sexual exploitation, depression or other mental-health concern, and addiction, and will know of their children's account so that they can set rules regarding their child's social-media use. And the Act will advance the State's important interests without burdening "substantially more speech than necessary to further those interests." *Paxton*, 606 U.S. at 471.

For example, when it comes to adults and older teenagers, the Act, at most, imposes an incidental burden on their speech. All they must do is submit to age verification to open an account, which they must do in a host of other contexts, *id.* at 479, and they "have no First Amendment right to avoid age verification." *Id.* at 483. And even when it comes to younger children, the Act does not block them "from accessing social media altogether," but "simply prevents them from creating accounts" without parental consent. *CCIA*, 2025 WL 3458571 at *6. *See* App. 350; R. Doc. 66, at ¶ 1. While they will not be able to access social-media platform's most addictive features without an account, they can view content that is publicly available to non-accountholders.

Other alternatives are insufficient to further the State's compelling interests. Self-verification of age has not prevented children under 13 from opening accounts and does nothing to protect older children. *See supra* 3, 7.[12] And using filters or parental controls have proven ineffective time and again. *See Internet Filtering* at 406 (noting that filtering is costly, that "there is little consistent evidence that filtering is

---

[12] *See also Age 13 rule isn't working—Most pre-teens already deep in social media*, MSN, https://www.msn.com/en-us/news/technology/age-13-rule-isn-t-working-most-pre-teens-already-deep-in-social-media/ar-BB1rmP6K?ocid=entnewsntp&pc=u531&cvid=800350cb5c6146ba8042bea14b2789 c1&ei=10; *Potential Risks of Content, Features, and Function*, American Psychological Ass'n 3 (April 2024).

effective at shielding young people from online sexual material," and that a more recent study "provide[s] strong evidence that a caregivers' use of Internet filtering technologies did not reduce children's exposure to a range of aversive online experiences including, but not limited to, encountering sexual content that made them feel uncomfortable").[13]  The Act is thus narrowly tailored and survives any level of scrutiny—and it easily survives intermediate scrutiny where States are given "latitude" to determine which "regulatory path" will advance its interests best.  *See TikTok*, 604 U.S. at 77–78.

The district court was wrong to conclude the Act cannot survive constitutional scrutiny.  Notably, the district court agreed that "unfettered social media access" harms children and that protecting children is a "compelling interest."  Add. 26; App. 378; R. Doc. 77, at 26.  It simply disagreed that the Act was sufficiently tailored to the State's interests, concluding the Act "is not narrowly tailored" as required to survive strict scrutiny.  *Id.*  But strict scrutiny is not the correct standard and to survive intermediate scrutiny, the Act needs only to "promote[] a substantial

---

[13] *See also* J. Jargon, Apple Admits to Bug in Screen Time Parental Controls (July 29, 2023), https://www.wsj.com/tech/personal-tech/apples-parental-controls-are-broken-55a2aa52?mod=article_inline; *Top 8 Ways Kids Can Bypass Parental Controls and How to Stop Them* (Dec. 29, 2023), https://medium.com/@susan.larcom/top-8-ways-kids-can-bypass-parental-controls-and-how-to-stop-them-c7461ceb783a; *Best Way to Remove Parental Controls on Android (Without Pin, 2025)*, https://www.youtube.com/watch?v=HzqJ6x9aOuc.

government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *Albertini,* 472 U.S. at 689). The Act clearly does that as shown above. And as also shown above, the Act can survive strict scrutiny in any event. Contrary to the district court's analysis, the Act is neither underinclusive nor overinclusive.

The district court first concluded the Act was underinclusive because it did not impose age-verification and parental-consent requirements on "private-message focused platforms like Snapchat." Add. 27; App. 379; R. Doc. 77, at 27. But "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015), and as the district court acknowledged, Facebook and Instagram have had higher incidents of child sexual exploitation than other services, Add. 27; App. 379; R. Doc. 77, at 27. In any event, the Act's current definition of social media platform does not exclude user-to-user services, Ark. Code Ann. § 4-88-1401(11)(A)(i), which further undermines the district court's reasoning.

The district court next concluded the Act was underinclusive because it "does nothing to protect users" who receive parental consent, such as requiring them "to hide obscene content." Add. 29; App. 381; R. Doc. 77, at 29. Yet again, "the Government 'need not address all aspects of a problem in one fell swoop,'" and "the

First Amendment poses no freestanding underinclusiveness limitation." *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee*, 575 U.S. at 449). Indeed, imposing such a requirement ignores the reality of the democratic process, not to mention that laws do not operate in isolation. There are legal limits on the State's ability to regulate other conduct, such as § 230 of the Communications Decency Act, and there are laws protecting children in other ways, such as the Children's Online Privacy Protection Act and various state laws. *See, e.g.*, Ark. Code Ann. §§ 5-27-306 (prohibiting "internet stalking of a child"); 5-27-609 (prohibiting minors from transmitting sexually explicit digital material); 5-27-610 (prohibiting doxxing a minor on a social-media platform).[14] There is thus no basis to conclude that the Act is impermissibly underinclusive even if strict scrutiny applies.

On the flip side, the district court concluded the law was overly burdensome and that the State could advance its interests with less-restrictive alternatives. But it is wrong on that front too. As a preliminary matter, it misunderstands the Act as burdening ideas and mistakenly analogizes the Act to the law in *Brown* prohibiting

---

[14] Moreover, the Arkansas legislature has subsequently amended the Social Media Safety Act to address additional aspects of the problem, including requiring the default settings for children to be set on the "most protective level of control for privacy and safety" and limiting nightly notifications that could interfere with children's sleep. *See* Act 900 of 2025, § 2 (to be codified at Ark. Code Ann. § 4-88-1402(d)(2)(A)-(B)).

the sale of violent video games to minors.  Add. 31; App. 383; R. Doc. 77, at 31.  The Act, however, is not a content-based restriction seeking "to restrict the *ideas* to which children may be exposed."  *Brown*, 564 U.S. at 794.  Minors without parental consent can still access content on the internet, including content that social-media platforms make accessible to non-accountholders, *see supra* 41, and they have ample alternative avenues to express their ideas, including email, *see* Ark. Code Ann. § 4-88-1401(11)(B).  Next, the district court concluded the Act must fail the narrow-tailoring analysis because a law prohibiting sex offenders from accessing social media sites did.  *See* Add. 31; App. 383; R. Doc. 77, at 31 (citing *Packingham v. North Carolina*, 582 U.S. 98 (2017)).  But that law was far broader than the Act, *see Packingham*, 582 U.S. at 107; *CCIA*, 2025 WL 3458571, at *6, and it served a narrower purpose, "keeping convicted sex offenders away from vulnerable victims," *Packingham*, 582 U.S. at 108.  The Act at issue here seeks to protect children not only from sexual exploitation, but also from other dangers posed by social media, including depression, sleep deprivation, and addiction.  *See supra* 2–7.  The district court also suggested the State could achieve its goals by encouraging parents to use filters (or perhaps not provide their children with internet access or internet-capable devices at all).  *See* Add.9–10, 31–32; App. 361–62, 383–84; R. Doc. 77, at 9–10, 31–32.  But that ignores the reality that filters are costly, confusing to use, and ineffective, *see supra*

41–42, and the fact that children can use school devices or friends' devices to access the internet, *see Paxton*, 606 U.S. at 477, 490–91. In any event, the district court overlooks that the harm the State wishes to mitigate is attendant to the platforms themselves and preventing children only from seeing explicit content does not, for example, sufficiently advance the State's interests in protecting children from depression and sleep deprivation. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 792, 803, 810 (1984) (concluding that a law that prohibited "posting of signs on public property," thereby prohibiting "communicating with the public in a certain manner," was narrowly tailored because the harm was "created by the medium of the expression itself").

In short, both the original and current Act survive constitutional scrutiny, and NetChoice failed to prove otherwise.

### C. NetChoice has not carried its burden to prove its facial challenge.

Even if the Act is unconstitutional in some applications, NetChoice failed to carry its burden to show its "unconstitutional applications substantially outweigh its constitutional ones" to succeed on a facial challenge. *Moody*, 603 U.S. at 724. That is fatal because NetChoice has litigated this case as a facial challenge. *See* App. 340; R. Doc. 64, at 2; App. 351; R. Doc. 66, at 2.

Because NetChoice chose to bring a facial challenge, "that decision comes at a cost"—namely, a "rigorous standard" that makes success "hard," 603 U.S. at 723, if not "impossible," *id.* at 745 (Barrett, J., concurring). To sustain a facial challenge based on a free-speech violation, "a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. That means a plaintiff must prove "a lopsided ratio" to prevail, *id.*, and NetChoice failed to do so here.

NetChoice failed to "evaluate the full scope of the law's coverage," *Moody*, 603 U.S. at 744, and the full range of applications, which reveal there are a myriad of undisputedly lawful applications. For example, the Act's age-verification and parental-consent provisions are surely lawful when enforced against social-media platforms that are "essentially the Facebook of porn," S. Captain, *Meet the Tumblr castaways trying to save its adult content from oblivion*, Fast Company (Dec. 8, 2018), https://tinyurl.com/25awcyw6.[15] After all, "no person—adult or child—has a First Amendment right to access speech that is obscene to minors without first submitting proof of age." *Paxton*, 606 U.S. at 478.

---

[15] *See Tumblr's NSFW ban is arousing a surge of sex-based social networks*, Fast Company (Feb. 6, 2019), https://www.fastcompany.com/90302918/tumblrs-nsfw-ban-is-arousing-a-surge-of-sex-based-social-networks.

To take another example, the Act is lawful when enforced against platforms that allow children under 13 to open accounts, when those platforms themselves specify that people must be over 13 to open accounts, and Children's Online Privacy Protection Act requires platforms "to obtain verifiable parental consent for the collection, use, or disclosure of personal information from children." 15 U.S.C. § 6502(b)(1)(A)(ii). And to take yet another example, the Act is lawful when enforced against a third-party vendor that retains identifying information about an individual after conducting an age verification. *See* Ark. Code Ann. § 4-88-1404.

NetChoice did not show that all the Act's lawful applications were substantially outweighed by unlawful ones, so it failed to "carry its burden" to prevail on a facial challenge. *Moody*, 603 U.S. at 744. As such, this Court should reverse the district court's judgment on the First Amendment claim.

## IV. THE SOCIAL MEDIA SAFETY ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE.

The Court should likewise reverse the district court's judgment on the Due Process Claim. NetChoice failed to show the Act is impermissibly vague, and that is true whether the Court analyzes the Act with the original definitions or the new ones.

For a statute to be unconstitutionally vague, it must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), or be "so standardless that it authorizes

or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008). "[P]erfect clarity and precise guidance" are not "required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. Moreover, a "knowledge requirement" in a statute "reduces any potential for vagueness." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010).

NetChoice argued, and the district court agreed, that the original law was "unconstitutionally vague" because it contained undefined terms like "primary purpose," "substantial function," and "predominant or exclusive function." Add. 34–37; App. 386–89; R. Doc. 77, at 34–37. But undefined terms do not make a statute vague; words are usually given "their usual and ordinary meaning," *Reed v. State*, 957 S.W.2d 174, 176 (Ark. 1997), and construed in context according to well-established principles of statutory interpretation, *see Bush v. State*, 2 S.W.3d 761, 763 (Ark. 1999). Regardless, the "qualitative standards" in the Act are easily understood and do not render it impermissibly vague or standardless. *See United States v. Palmer*, 917 F.3d 1035, 1038 (8th Cir. 2019) ("[W]e do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." (quoting *Johnson v. United States,* 576 U.S. 591, 604 (2015)); *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019) (rejecting vagueness challenge where a statute did "not declare how an entity's 'principal business

purpose' is quantified, *e.g.*, floor space, gross revenue, net revenue, or amount in inventory"); *see also O'Neill v. Louisville/Jefferson Cnty. Metro Gov't*, 662 F.3d 723, 728 (6th Cir. 2011) (using "primary purpose" in defining "Class A kennel").

In any event, the 2025 amendments revised the challenged definitions. By defining "social media platform" based on six objective characteristics and exclusions, *see* Ark. Code Ann. § 4-88-1401(11), the current Act continues to provide fair notice of what entities are subject to its age-verification and parental-consent requirements and provides standards for enforcement. And the Act's terms "are quite different from the sorts of terms" that the Supreme Court has considered impermissibly vague, and its "knowledge requirement further reduces any potential for vagueness." *Holder*, 561 U.S. at 130.

Notably, all NetChoice has done to attempt to show the current Act's terms are vague is assert that the new definition of social media platform is "even vaguer" than the prior one with no elaboration and to point out some terms lack definitions. MTD Opp. 17. But NetChoice fails to articulate why it believes the definition of social media platforms is vague or why it assumes terms like "online platform" require a statutory definition, *id.*, when "a statutory term is not impermissibly vague simply because it lacks a statutory definition," *United States v. Concepcion*, 139 F.4th 242, 250 (2d Cir. 2025). NetChoice also fails to identify a single member who is

uncertain whether the Act's requirements apply to them under the amended definitions. This is fatal because whether a statute is vague is not assessed in the abstract. *See Holder*, 561 U.S. at 20 (explaining "the rule" is that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others" and there is "no exception for conduct in the form of speech"); *Adam & Eve*, 933 F.3d at 959 (explaining that a "vagueness challenge" does not permit a plaintiff to 'speculat[e] about possible vagueness in hypothetical situations not before the Court'" and that, because "[i]t is undisputed that a substantial portion of [the plaintiff's] business involves selling items the statute reaches," the plaintiff's "vagueness challenge falls apart" (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). The Court should therefore reverse summary judgment for NetChoice on its vagueness claim too.

## V. THE DISTRICT COURT ISSUED A JUDGMENT THAT EXCEEDS ITS EQUITABLE POWERS AND IS OVERBROAD.

If the Court agrees with the district court that the Act violates the First Amendment or Due Process Clause, it nevertheless should not affirm the district court's judgment. It should instead narrow the scope of the declaratory judgment and injunction, which exceed the district court's authority and are overbroad. The district court declared the entirety of the original Social Media Safety Act unconstitutional and enjoined the Attorney General from enforcing it. Add. 42; App. 394; R.

Doc. 78. But NetChoice did not show that it had standing to challenge each provision or that each provision is unconstitutional, and it did not show that a universal injunction was necessary to give it complete relief.

It is a well-established "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (quoting *Califano*, 442 U.S. at 702). That means an injunction must be crafted only to "offer complete relief *to the plaintiffs before the court*" and that "federal courts lack authority to issue" universal injunctions." *Id.* at 852, 856 (emphasis in original). It also means that "injunction[s] must be tailored to remedy specific harm shown." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982); *see Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

What's more, if relief is not tailored, it not only runs afoul of equitable principles and statutory authority, but it also can violate Article III's requirements. After all, "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and "the fact that the plaintiff had standing to challenge one provision of a statute did not necessarily mean that he also had standing to challenge another." *Hershey*, 86 F.4th at 1229 (quoting *Davis v. FEC*, 554 U.S. 724, 733 (2008)) (brackets

omitted); *see Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 598 (5th Cir. 2010) ("[I]f [a plaintiff] is limited by one provision of an ordinance and makes a facial challenge due to the overbreadth of a different provision, there is no constitutional standing, *i.e.,* there is no 'case or controversy,' as to the separate provision.").

The district court's opinion and judgment here violate these well-established principles. Indeed, the opinion wrongly purports to enjoin the Act itself, Add. 41; App. 393; R. Doc. 77, at 41, even though an injunction cannot operate against the statute itself but must be directed only at the actions of a defendant tasked with executing it. *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("If a case for preventive relief be presented, the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding."); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) ("A federal injunction does not erase an unconstitutional state law from existence; federal courts cannot repeal state laws."). To be fair, the judgment properly directs the injunction to a party; however, it is still overbroad as it declares the entire Act unconstitutional (even provisions about which NetChoice made no arguments and for which NetChoice has no standing to challenge) and permanently enjoins the Attorney General's enforcement of the entire Act (even though he does not enforce the entire Act). Add. 42; App. 394; R. Doc. 78, at 1.

Accordingly, even if the judgment could be seen as fixing the terminology problem in the opinion, it does not fix the underlying flaws with the scope of the relief that the district court ordered. "The district court's decision rests on the flawed notion that by declaring the [Act] unconstitutional, it eliminated the legal effect of the statute in all contexts," "[b]ut 'federal courts have no authority to erase a duly enacted law from the statute books.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)). A few examples highlight the district court's lack of authority to issue the relief it did.

Consider, for example, that the district court enjoined the Attorney General from enforcing § 4-88-1404. But that provision prohibits "[a] commercial entity or third-party vendor" from "retain[ing] any identifying information" after performing an age verification. Ark. Code Ann. § 14-88-1404(a). And, if that prohibition is violated, it authorizes damages for an individual who is injured as a result of the violation. *Id.* § 14-88-1404(b). Far from proving this provision violated the Constitution, NetChoice's summary-judgment brief did not mention this provision, so there was no showing these subsections violated the First Amendment or were unconstitutionally vague. *See* R. Doc. 67, at iii–iv. Moreover, NetChoice did not and could not establish standing to challenge this provision on First Amendment grounds.

That is because NetChoice based its standing for the First Amendment claim on the rights of its members' users, and users are not injured by this provision. There is no way that users suffer any cognizable injury from a provision that allows them to recover damages resulting from the improper retention of identifying information, so NetChoice certainly cannot base its standing on those users to challenge this provision. *See In re Gee*, 941 F.3d at 161–62.

In any event, the Attorney General does not enforce § 4-88-1404—injured individuals do—so the district court has no authority to enjoin him from enforcing that provision. It similarly lacked authority to prohibit him from enforcing other provisions he does not enforce, such as §§ 4-88-1403(b)(1) and § 4-88-1403(c). Because any injury caused by these provisions is not redressable by a judgment against the Attorney General, NetChoice lacked standing to challenge these provisions in a suit against him. *See, e.g.*, *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 959 (8th Cir. 2015) ("Because the defendant officials do not enforce the Act, a declaratory judgment would not meet the requirement of redressability."); *Jacobson*, 974 F.3d at 1254–55 (explaining injunctive or declaratory relief against an official that does not enforce a law provides no redress).

The district court also enjoined the provision that gives the Attorney General enforcement authority, § 4-88-1403(b)(2). But it is nonsensical to enjoin the

Attorney General from enforcing a provision that merely bestows enforcement authority on him rather than simply enjoining the provision that he is actually enforcing: § 4-88-1402. This further betrays the impermissible overbreadth of the relief ordered.

So too does the fact that the district court issued a universal injunction. "[U]under the Judiciary Act, federal courts lack authority" to issue "universal injunction[s]," *CASA*, 606 U.S. at 856, so the district court had no authority to enjoin the Attorney General from enforcing the Act against everyone, not just NetChoice's members. *See CCIA*, 2025 WL 3458571, at *10 n.13 (recognizing that a "district court's injunction would require modification, at the very least," in light of the Supreme Court's recent *CASA* opinion). This Court should accordingly narrow the district court's judgment and provide guidance regarding the constitutional and statutory limitations on judicial authority.

## Conclusion

For the foregoing reasons, the Court should hold that the Social Media Safety Act does not violate the Constitution and reverse and vacate the district court's judgment or, at the very least, narrow the scope of the injunction and the declaratory judgment.

Respectfully submitted,

TIM GRIFFIN
    Arkansas Attorney General

AUTUMN HAMIT PATTERSON
    Solicitor General

NOAH P. WATSON
    Deputy Solicitor General

RYAN HALE
    Senior Assistant Attorney General

OFFICE OF THE ARKANSAS
    ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
(501) 295-2700
autumn.patterson@arkansasag.gov
noah.watson@arkansasag.gov
ryan.hale@arkansasag.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,997 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Equity A, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

*/s/Autumn Hamit Patterson*
Autumn Hamit Patterson

## CERTIFICATE OF SERVICE

I certify that on December 3, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/Autumn Hamit Patterson*
Autumn Hamit Patterson