# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

—————————————

NETCHOICE, LLC,

*Plaintiff-Appellee,*

v.

TIM GRIFFIN, in his official capacity as Attorney General of Arkansas,

*Defendant-Appellant.*

—————————————

On Appeal from the United States District Court for the Western District of Arkansas, No. 5:23-cv-5105 (Hon. Timothy L. Brooks)

—————————————

## APPELLEE'S BRIEF

—————————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee NetChoice, LLC*

January 22, 2026

Appellate Case: 25-1889     Page: 1     Date Filed: 01/23/2026 Entry ID: 5600150

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

This lawsuit challenges the constitutionality of Arkansas' Social Media Safety Act, which sharply curtails access to NetChoice members' popular online services—e.g., Facebook, Instagram, Nextdoor, Pinterest, and Snapchat—by requiring them (i) to verify the age of every Arkansan who attempts to create an account and (ii) to prevent minors from creating new accounts absent parental consent. The district court correctly awarded summary judgment to NetChoice, holding that the Act's age-verification and parental-consent requirements violate the First Amendment and are unconstitutionally vague. Arkansas has appealed and requested 20 minutes for oral argument. Given the importance of the issues presented, NetChoice agrees that oral argument is appropriate and likewise requests 20 minutes.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), NetChoice hereby certifies that it has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

Appellate Case: 25-1889    Page: 3    Date Filed: 01/23/2026 Entry ID: 5600150

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT .......................................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF AUTHORITIES .................................................................... v

INTRODUCTION .................................................................................. 1

STATEMENT OF ISSUES .................................................................... 4

STATEMENT OF THE CASE ............................................................... 5

    A.    Factual and Legal Background ............................................ 5

        1.    Adults and minors alike engage in First Amendment activity on online services covered by the Act. ........................ 5

        2.    Parents have many ways to restrict and monitor their children's online activity. ......................... 7

    B.    Procedural History ............................................................. 10

        1.    Arkansas enacts the Social Media Safety Act. .......................... 10

        2.    The district court holds the Act unconstitutional. ...................... 11

        3.    The Arkansas legislature amends the Act, significantly broadening its coverage. ................................. 13

        4.    The state files a Rule 59(e) motion, takes an appeal, and then moves to dismiss its appeal and vacate the judgment. ....................... 15

SUMMARY OF ARGUMENT ............................................................... 16

STANDARDS OF REVIEW .................................................................. 19

ARGUMENT ........................................................................................ 19

I.    The District Court Correctly Held That The Act Violates The First Amendment, And It Continues To Do So As Amended. ................................. 19

Appellate Case: 25-1889    Page: 4    Date Filed: 01/23/2026 Entry ID: 5600150

A.     Both Before and After the Amendments, the Act Restricts Massive Quantities of Protected Speech. ..............................................19

B.     The Act Continues to Draw Content- and Speaker-Based Distinctions That Trigger Strict Scrutiny. ...........................................29

C.     The Act Cannot Survive Any Level of Heightened Scrutiny. .............33

D.     The Act's Unconstitutional Applications Substantially Outweigh Any Constitutional Applications. .....................................41

E.     The District Court Correctly Held That NetChoice Has Prudential Standing to Bring Its First Amendment Claim. .................44

II.     The District Court Correctly Held That The Act Is Unconstitutionally Vague, And The Amendments Exacerbate That Defect. ...............................50

III.     The District Court Correctly Denied Arkansas' Motion To Amend The Judgment. .................................................................................................54

CONCLUSION .................................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

iv

# TABLE OF AUTHORITIES

**Cases**

*Angelilli v. Activision Blizzard, Inc.*,
  781 F.Supp.3d 691 (N.D. Ill. 2025) ...................................................36

*Ark. Times LP v. Waldrip ex rel. Univ. of Ark. Bd. of Trs.*,
  37 F.4th 1386 (8th Cir. 2022).........................................................29

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)......................................................................47

*Baggett v. Bullitt*,
  377 U.S. 360 (1964).......................................................................50

*Banister v. Davis*,
  590 U.S. 504 (2020)................................................................. 5, 55

*Blick v. Ann Arbor Pub. Sch. Dist.*,
  105 F.4th 868 (6th Cir. 2024)........................................................25

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)............................................................. *passim*

*CCIA v. Paxton*,
  747 F.Supp.3d 1011 (W.D. Tex. 2024) ....................................... 1, 45

*CCIA v. Uthmeier*,
  2025 WL 1570007 (N.D. Fla. June 3, 2025) ......................... 24, 45, 48

*CCIA v. Uthmeier*,
  2025 WL 3458571 (11th Cir. Nov. 25, 2025) ............................. 23, 50

*Chafin v. Chafin*,
  568 U.S. 165 (2013)......................................................................54

*Citizens United v. FEC*,
  558 U.S. 310 (2010)......................................................................30

*City of Austin v. Reagan Nat'l Advert. of Aus., LLC*,
  596 U.S. 61 (2022).......................................................................30

Appellate Case: 25-1889    Page: 6    Date Filed: 01/23/2026 Entry ID: 5600150

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ...................................................................51

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) .................................................................30

*Colo. Republican Fed. Campaign Comm. v. FEC,*
518 U.S. 604 (1996) .................................................................39

*Couch v. Am. Bottling Co.,*
955 F.3d 1106 (8th Cir. 2020) ................................................19

*Council of Ins. Agents & Brokers v. Juarbe-Jimenez,*
443 F.3d 103 (1st Cir. 2006) ...................................................49

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ................................................. 21, 22, 35

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) ......................................................... 5, 50

*Fraternal Ord. of Police v. United States,*
152 F.3d 998 (D.C. Cir. 1998) ................................................49

*Free Speech Coal. v. Paxton,*
606 U.S. 461 (2025) ............................................................ *passim*

*Huelsman v. Civic Ctr. Corp.,*
873 F.2d 1171 (8th Cir. 1989) ................................................41

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 33 (1977) ...................................................................49

*Iancu v. Brunetti,*
588 U.S. 388 (2019) .................................................................43

*Indigo Room, Inc. v. City of Ft. Myers,*
710 F.3d 1294 (11th Cir. 2013) ..............................................27

*Interactive Digit. Software Ass'n v. St. Louis Cnty.,*
329 F.3d 954 (8th Cir. 2003) ............................................. 5, 34, 47

Appellate Case: 25-1889    Page: 7    Date Filed: 01/23/2026 Entry ID: 5600150

*Interstate Cir., Inc. v. City of Dallas*,
  390 U.S. 676 (1968)..................................................................................51

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)..................................................................................51

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004)..................................................................................47

*McCullen v. Coakley*,
  573 U.S. 464 (2014).......................................................................... 34, 40

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)..................................................................................45

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)............................................................ 19, 41, 42, 45

*NAACP v. Button*,
  371 U.S. 415 (1963)..................................................................................50

*NetChoice v. Carr*,
  2025 WL 1768621 (N.D. Ga. June 26, 2025)........................................1

*NetChoice v. Carr*,
  789 F.Supp.3d 1200 (N.D. Ga. 2025) ..................................................23

*NetChoice v. Fitch*,
  134 F.4th 799 (2025).......................................................... 4, 45, 47, 50

*NetChoice v. Fitch*,
  2025 WL 2078435 (5th Cir. July 17, 2025).........................................23

*NetChoice v. Fitch*,
  145 S.Ct. 2658 (2025)..............................................................................23

*NetChoice v. Murrill*,
  2025 WL 3634112 (M.D. La. Dec. 15, 2025).......................... 1, 23, 45

*NetChoice v. Reyes*,
  748 F.Supp.3d 1105 (D. Utah 2024).......................................... 1, 23, 31

vii

*NetChoice v. Yost*,
778 F.Supp.3d 923 (S.D. Ohio 2025) ........................................................ *passim*

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) .................................................. 47, 49, 50

*NIFLA v. Becerra*,
585 U.S. 755 (2018) .......................................................................30

*Ohio Ass'n of Indep. Schs. v. Goff*,
92 F.3d 419 (6th Cir. 1996) .............................................................49

*Osediacz v. City of Cranston*,
414 F.3d 136 (1st Cir. 2005) ............................................................48

*Pa. Psychiatric Soc. v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002) .............................................................49

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .................................................................. *passim*

*Redlich v. City of St. Louis*,
51 F.4th 283 (8th Cir. 2022) ...................................................... 28, 29

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................... 17, 29

*Reno v. ACLU*,
521 U.S. 844 (1997) .......................................................................24

*Reuter v. Jax Ltd., Inc.*,
711 F.3d 918 (8th Cir. 2013) ...........................................................56

*Rumsfeld v. FAIR, Inc.*,
547 U.S. 47 (2006) .......................................................................29

*Saylor v. Jeffreys*,
131 F.4th 864 (8th Cir. 2025) .........................................................19

*Shimer v. Washington*,
100 F.3d 506 (7th Cir. 1996) ...........................................................47

viii

*Sipp v. Astrue,*
    641 F.3d 975 (8th Cir. 2011) .................................................................. 5, 56

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) .................................................... 25, 26, 36, 45

*State v. Packingham,*
    777 S.E.2d 738 (N.C. 2015) .................................................................26

*Students Engaged in Advancing Tex. v. Paxton,*
    765 F.Supp.3d 575 (W.D. Tex. 2025) ....................................................31

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025).................................................................................28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969)..............................................................................21

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)..............................................................................56

*Turner Broad. Sys. Inc. v. FCC,*
    512 U.S. 622 (1994) ...................................................................... 32, 45

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000)....................................................................... 22, 47

*United States v. Stevens,*
    559 U.S. 460 (2010)..............................................................................43

*United States v. Williams,*
    553 U.S. 285 (2008)..............................................................................50

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)..............................................................................51

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988)....................................................................... *passim*

*Ways v. City of Lincoln,*
    274 F.3d 514 (8th Cir. 2001)........................................................ 4, 38, 47

Appellate Case: 25-1889    Page: 10    Date Filed: 01/23/2026 Entry ID: 5600150

*Winters v. New York,*
    333 U.S. 507 (1948) ................................................................51

**Constitutional Provisions**

U.S. Const. amend. I ................................................................5

U.S. Const. amend. V ................................................................5

**Statutes**

Ark. Act 689 of 2023, §1101(7)(A) ................................................11

Ark. Act 689 of 2023, §1101(7)(B)(i) ................................................11

Ark. Act 689 of 2023, §1101(7)(B)(iii) ................................................11

Ark. Act 689 of 2023, §1101(7)(B)(v) ................................................11

Ark. Act 689 of 2023, §1101(8)(B) ................................................11

Ark. Act 689 of 2023, §1101(8)(C) ................................................11

Ark. Act 689 of 2023, §1102 ................................................10

Ark. Act 689 of 2023, §1103 ................................................10

Ark. Code §4-88-1401(5) ................................................13

Ark. Code §4-88-1401(5)(A) ................................................ 14, 38, 53

Ark. Code §4-88-1401(5)(B) ................................................ 2, 14, 17

Ark. Code §4-88-1401(9) ................................................14

Ark. Code §4-88-1401(11) ................................................ 13, 52

Ark. Code §4-88-1401(11)(A) ................................................ 2, 4, 14, 38

Ark. Code §4-88-1401(11)(A)(i) ................................................ *passim*

Ark. Code §4-88-1401(11)(B) ................................................ 2, 14, 17, 30

Ark. Code §4-88-1402(a) ................................................ 52, 53

Appellate Case: 25-1889    Page: 11    Date Filed: 01/23/2026 Entry ID: 5600150

Ark. Code §4-88-1402(a)-(c) ....................................................................13

Ark. Code §4-88-1402(b)(1) ....................................................................53

Ark. Code §4-88-1402(b)(2) ....................................................................53

Ark. Code §4-88-1402(c)(1) ............................................................... 52, 53

Ark. Code §4-88-1403(a) ........................................................................13

Ark. Code §4-88-1403(b)(1) ....................................................................52

Ark. Code §4-88-1403(b)(2)(A) ...............................................................52

Ark. Code §4-88-1403(b)(2)(B).................................................................52

Ark. Code §4-88-1403(c)(1) ............................................................... 15, 25

Ark. Code §4-88-1403(c)(1)-(2) ...............................................................53

Ark. Code §4-88-1403(c)(4) .....................................................................53

Ark. Code §4-88-1403(d)............................................................... 3, 30

Ark. Code §4-88-1403(d)(1) ........................................................... 3, 15, 33

Ark. Code §4-88-1403(d)(2) ........................................................ 14, 32, 33

Ark. Code §4-88-1403(d)(3) ....................................................................14

**Other Authorities**

Op. Ark. Att'y Gen. No. 32 (2025) ..........................................................16

Order, *CCIA v. Att'y Gen.*,
No. 25-11881 (11th Cir. Dec. 11, 2025), Dkt.64 .................................23

Washington Post, *Digital Commenting Community*,
https://perma.cc/9MR4-KG2S ........................................................ 32

Appellate Case: 25-1889     Page: 12     Date Filed: 01/23/2026 Entry ID: 5600150

## INTRODUCTION

The Arkansas Social Media Safety Act ("Act") is the latest in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. Books, comics, movies, rock music, and video games have all been accused of harming minors in the past. Today, similar debates rage about "social media." Those debates are important, and the government may certainly participate in them. But the First Amendment does not allow the government to resolve them by restricting minors' access to protected speech. The Constitution instead leaves the power to decide what speech minors may access where it belongs: with their parents.

Nevertheless, several states have recently enacted statutes restricting minors' access to some of the most popular "social media" services. Courts across the country have held that these laws violate the First Amendment. *See, e.g.*, *NetChoice v. Murrill*, 2025 WL 3634112 (M.D. La. Dec. 15, 2025); *CCIA v. Paxton*, 747 F.Supp.3d 1011 (W.D. Tex. 2024), *appeal filed*, No. 24-50721 (5th Cir.); *NetChoice v. Yost*, 778 F.Supp.3d 923 (S.D. Ohio 2025), *appeal filed*, No. 25-3371 (6th Cir.); *NetChoice v. Reyes*, 748 F.Supp.3d 1105 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir.); *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025), *appeal filed*, No. 25-12436 (11th Cir.). And rightly so. While states may certainly take steps to protect minors who use online services, restricting minors' (and adults')

access to them is not a narrowly tailored means of advancing a legitimate governmental interest. Just as the government may not restrict minors' access to libraries, movies, or video games, the government may not restrict their access to websites that for many are valuable "sources for knowing current events," "speaking," "listening," and "otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). As the district court correctly concluded, the Act runs afoul of these bedrock principles.

While the Act was amended shortly after the court's final decision came down, those amendments do nothing to cure its constitutional defects. To the contrary, they confirm that Arkansas' restrictions on "social media" remain particularly egregious. For one thing, as amended, the Act's coverage is breathtakingly broad. It requires the overwhelming majority of online services that allow users to create accounts and "facilitate user-[generated]… expression," Ark. Code §4-88-1401(11)(A)— everything from ESPN to Nextdoor to the Social Science Research Network ("SSRN")—to verify the age of each individual seeking to create an account and require minors to demonstrate parental consent. The Act thus burdens vast amounts of constitutionally protected expression.

To make matters worse, the Act continues to discriminate against disfavored content and speakers. It exempts "news-gathering organization[s]," "school[s]," and "not-for-profit organization[s]" (among others). *Id.* §§4-88-1401(5)(B), (11)(B), -

2

Appellate Case: 25-1889    Page: 14    Date Filed: 01/23/2026 Entry ID: 5600150

1403(d).  And it carves out "a news or public interest broadcast, website video, report, or event" from its restrictions.  *Id.* §4-88-1403(d)(1).  The Act thus privileges news and educational materials over "social" interaction and elevates provider-generated content over user-generated content.  By drawing such "content-based and speaker-based distinctions," the Act triggers strict scrutiny.  App.376, R.Doc.77.at.24.  And it cannot survive that demanding test—or even the "intermediate scrutiny" that applies to content-neutral laws—because it restricts all manner of constitutionally protected speech while doing little, if anything, to advance the state's asserted interest in protecting minors.  App.382, R.Doc.77.at.30; *see* R.Doc.44.at.38, 48.

The Act also continues to be void for vagueness.  First, it is unclear what entities are subject to its age-verification and parental-consent regime.  The Act expressly requires "a social media company" to comply, but after the 2025 amendments it no longer even defines that term.  The amended Act also is unclear about whether a "social media platform" and a "covered social media platform" must comply.  In addition, the Act is vague about regulated entities' obligations.  For example, it is unclear whether they must perform age-verification for *all* account holders or only those opening a new account; whether they must prevent minors from accessing their services *without* an account; and whether or when they must

3

use third-party vendors to perform age-verification rather than performing it themselves.

Arkansas' counterarguments lack merit. Its contention that NetChoice lacks prudential standing is squarely foreclosed by *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988)—a case that the district court found "particularly compelling," R.Doc.44.at.28, yet the state fails to mention. Arkansas' suggestion that the Act regulates "conduct" rather than "expression," AG.Br.30-31, is risible; the Act targets "social media platform[s]" *precisely because* they "facilitate" user-generated "interaction, expression, or communication." Ark. Code §4-88-1401(11)(A). Arkansas' contentions that the Act has "myriad … lawful applications" and that there is no less-restrictive alternative, *see* AG.Br.41-42, 44-45, 47, were not raised below and find no support in the record or the law. And the district court certainly did not abuse its broad discretion in denying Arkansas' scope-of-relief arguments as both untimely and meritless. This Court should affirm.

## STATEMENT OF ISSUES

**1.** Whether the district court correctly held that NetChoice has prudential standing to bring its First Amendment claim.

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988); *Ways v. City of Lincoln*, 274 F.3d 514 (8th Cir. 2001); *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025).

Appellate Case: 25-1889    Page: 16    Date Filed: 01/23/2026 Entry ID: 5600150

**2.** Whether the Act violates the First Amendment.

U.S. Const. amend. I; *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011); *Packingham v. North Carolina*, 582 U.S. 98 (2017); *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003).

**3.** Whether the Act is unconstitutionally vague.

U.S. Const. amend. V; *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012); *City of Chicago v. Morales*, 527 U.S. 41 (1999).

**4.** Whether the district court abused its discretion in denying Arkansas' motion to amend the judgment.

*Banister v. Davis*, 590 U.S. 504 (2020); *Sipp v. Astrue*, 641 F.3d 975 (8th Cir. 2011).

## STATEMENT OF THE CASE

### A.   Factual and Legal Background

#### 1.   Adults and minors alike engage in First Amendment activity on online services covered by the Act.

NetChoice is a trade association whose members operate many online services, including Facebook, Instagram, Nextdoor, Pinterest, and Snapchat. App.111-12, R.Doc.54-1.at.1-2.[1]   Those services "allow users to gain access to

---

[1] Meta Platforms, Inc. ("Meta") operates Facebook and Instagram; Nextdoor Holdings, Inc. ("Nextdoor Holdings") operates Nextdoor; Pinterest, Inc. operates Pinterest; and Snap, Inc. ("Snap") operates Snapchat.  App.112, R.Doc.54-1.at.2.

Appellate Case: 25-1889     Page: 17     Date Filed: 01/23/2026 Entry ID: 5600150

information and communicate with one another about it on any subject that might come to mind." App.359, R.Doc.77.at.7. On "Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." App.359, R.Doc.77.at.7. Instagram allows users to share vacation pictures and informative videos. App.120-21, R.Doc.54-2.at.3-4. Nextdoor is aimed at facilitating constructive neighborhood connections and conversations. App.142, R.Doc.54-3.at.3. Pinterest is a visual discovery engine for finding ideas like recipes, home and style inspiration, and more. App.259-60, R.Doc.54-4.at.107-08. And Snapchat is a camera and communications service that allows users to communicate using text, audio and video calls, photos, and short videos. App.47-48, R.Doc.17-3.at.1-2.

These services allow adults and teens to sign up for an account, create and share their own content, and view others' content. App.120, R.Doc.54-2.at.3; App.47-48, R.Doc.17-3.at.1-2; App.140-41, R.Doc.54-3.at.1-2; App.259-60, R.Doc.54-4.at.107-08. Some Arkansas teens use them to read the news, connect with friends, explore new interests, and showcase their creative talents. App.113-14, R.Doc.54-1.at.3-4; App.123, R.Doc.54-2.at.6. Others use them to participate in public discussion on salient topics of the day. App.114, R.Doc.54-1.at.4. While minors "cannot vote for the lawmakers that represent them, [they] can use social media to make their voices heard on issues that affect them." App.383,

6

R.Doc.77.at.31. Minors also use NetChoice members' services to build communities and connect with others who share similar interests or experiences. App.114, R.Doc.54-1.at.4.

### 2. Parents have many ways to restrict and monitor their children's online activity.

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social media" websites are appropriate for minors. Concerns that new means of expression may be harmful to minors, however, are hardly new. The same basic concerns have been raised repeatedly in the past about other types of speech and mediums of expression, from "penny dreadfuls" to "motion pictures," "comic books," and more. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011).

While the government can certainly participate in those debates, the Supreme Court has repeatedly rejected government efforts to try to resolve them by decreeing what constitutionally protected speech minors may access. After all, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794-95. And while states have an interest in protecting minors from harm, that interest "does not include a free-floating power to restrict the ideas to which [they] may be exposed." *Id.* In a Nation

7

that values the First Amendment, the preferred response is to let parents decide what speech their children may access.

Parents have many tools at their disposal to control their children's access to "social media" should they choose to do so. "Parents decide what, if any, internet-capable devices to give their child." App.361, R.Doc.77.at.9. And those who let their children use such devices have many ways to control what they see and do online. Device manufacturers (e.g., Google, Microsoft) "offer device-level parental controls" that empower parents to set time limits, filter online content, and control privacy settings. App.361, R.Doc.77.at.9. Third-party applications offer similar tools. App.361-62, R.Doc.77.at.9-10. Cell carriers and broadband providers (e.g., Verizon, Comcast Xfinity) offer "tools that allow parents to block certain applications and websites from their children's devices" and "ensure that their children are texting and chatting with trusted contacts only." App.362, R.Doc.77.at.10. Most wireless routers (e.g., NetGear, TP-Link) have similar tools, as do Internet browsers (e.g., Google Chrome, Mozilla Firefox). App.362-63, R.Doc.77.at.10-11.

NetChoice members have also devoted extensive resources to developing policies and practices to protect minors who use their services. App.364, R.Doc.77.at.12; *see, e.g.*, App.127-36, R.Doc.54-2.at.10-19. For starters, many prohibit minors under age 13 from accessing their services. App.364-65,

8

R.Doc.77.at.12-13.  And when NetChoice members permit minors to access their services, they provide numerous ways for parents to oversee their children's activity. For example, "Facebook and Instagram have 'supervision tools' through which parents can set time limits, view privacy and content settings, and monitor what accounts their child is connected with."  App.363-64, R.Doc.77.at.11-12.  Snapchat similarly "offers a 'family center' through which parents can see who their child is communicating with in the app."  App.364, R.Doc.77.at.12.

On top of all that, NetChoice members have invested (and continue to invest) significant time and resources into curating the content that minors and adults see on their services.  App.365, R.Doc.77.at.13.  Many members "restrict the uploading of violent and sexual content, bullying, and harassment."  App.365, R.Doc.77.at.13. Some use age-gating "to try to keep minors from seeing certain content visible to adults, or to keep younger teens from seeing content visible to older teens." App.365, R.Doc.77.at.13.  When a NetChoice member determines that certain content violates its policies, it may add a warning label or disclaimer, restrict access, or take it down.  App.366, R.Doc.77.at.14.  And "[r]epeat violators of a platform's policies may find themselves suspended or banned from the platform."  App.366, R.Doc.77.at.14.

Appellate Case: 25-1889     Page: 21     Date Filed: 01/23/2026 Entry ID: 5600150

### B.    Procedural History

#### 1.    Arkansas enacts the Social Media Safety Act.

Notwithstanding the many cases striking down government efforts to decree what constitutionally protected speech minors may access and the wealth of tools available to help parents restrict and oversee Internet access, Arkansas has taken it upon itself to limit minors' access to online speech.  In April 2023, it enacted the Social Media Safety Act—Act 689 of 2023—which restricted minors' access to several of the most popular "social media platforms," significantly curtailing their ability to engage in core First Amendment activities.[2]  In particular, the statute required certain "social media companies" to verify the age of every individual attempting to create an account on their "social media platforms" and to prohibit minors from creating accounts and accessing these "platforms" unless they provided proof of parental consent.  Act 689, §§1102, 1103.

As originally enacted, the Act covered only a few of the largest and most popular online services.  It defined "social media company" as a company that offers "an online forum" in which individuals may "establish an account … for the primary purpose of interacting socially with other[s]"; "create posts or content"; "[v]iew [others'] posts or content"; and "establish[] mutual connections through request and

---

[2] Act 689 is reproduced in the statutory addendum.  Citations correspond to the provisions of Chapter 88, subchapter 11 of the Arkansas Code where the Act was originally codified.  *See* App.355 n.1, R.Doc.77.at.3 n.1.

Appellate Case: 25-1889     Page: 22     Date Filed: 01/23/2026 Entry ID: 5600150

acceptance." Act 689, §1101(7)(A). But the statute then laid out a slew of speaker- and content-based exclusions. For example, it did not apply to a "[m]edia company that exclusively offers subscription content" and whose "primary purpose is not social interaction"; a "[m]edia company that exclusively offers interacti[ve] gaming"; or a "[c]ompany that provides career development opportunities." Act 689, §1101(7)(B)(i), (iii), (v).

The statute's definition of "social media platform" was similarly riddled with carveouts, privileging "[n]ews, sports, entertainment," "[o]nline shopping," and "[d]irect messaging" over other types of speech. *See* Act 689, §1101(8)(B). It also exempted "news-gathering organization[s]," "cloud service providers," and "a news or public interest broadcast, website video, report, or event." Act 689, §1103(d). Nor did it cover any online service "controlled by a business entity that has generated less than one hundred million dollars … in annual gross revenue." Act 689, §1101(8)(C). As a result, the statute regulated only a handful of large companies, including Meta, Nextdoor Holdings, and X Corp. *See* App.356-58, R.Doc.77.at.4-6; App.390, R.Doc.77.at.38.

### 2. The district court holds the Act unconstitutional.

NetChoice sued on behalf of its members and moved for a preliminary injunction. The district court granted that motion just before the law's effective date. R.Doc.44.at.1-4. The court began by assuring itself that NetChoice had both Article

11

III and "prudential" standing. *See* R.Doc.44.at.22-29. On the merits, the court held that Act 689 likely violates the First Amendment and is likely unconstitutionally vague. *See* R.Doc.44.at.30-48.

Arkansas chose not to appeal the preliminary injunction and instead sought discovery. NetChoice moved for summary judgment and a stay of discovery. The district court expressed "skeptic[ism]" that any facts the state might adduce in discovery could show that the Act is narrowly tailored to a significant governmental interest. App.345, R.Doc.64.at.6. In a "spirit of liberality," however, the court allowed the state to take discovery on NetChoice members' parental-control tools and efforts to keep minors safe online. *See* App.343-46, R.Doc.64.at.4-7. Arkansas then obtained written discovery and deposed officials from Meta, Nextdoor Holdings, and Snap. *See* App.407, R.Doc.72-1.at.3; App.468, R.Doc.72-2.at.3; App.506, R.Doc.72-3.at.3.

After the close of discovery, NetChoice renewed its motion for summary judgment. And, on March 31, 2025, the district court awarded summary judgment to NetChoice on both its First Amendment claim and its vagueness claim. On the former, the court held that the Act triggers strict scrutiny because it imposes "both content-based and speaker-based distinctions" on constitutionally protected speech. App.376, R.Doc.77.at.24; *see* App.371-76, R.Doc.77.at.19-24. And the court held that the Act cannot survive that demanding standard because it is both "seriously

12

overinclusive"—*i.e.,* it suppresses large amounts of constitutionally protected speech that does not implicate the state's asserted interests—and so "underinclusive[]" and "[in]effective" as to "raise[] serious doubts about whether the government is in fact pursuing the interest[s] it invokes." App.381-82, R.Doc.77.at.29-30. The court also held that "Act 689 is unconstitutionally vague because it fails to adequately define which entities are subject to its requirements, risking chilling effects and inviting arbitrary enforcement." App.388, R.Doc.77.at.36; *see* R.Doc.44.at.30-35. As the court observed, "the state's attorney asserts that Snapchat is exempted from the Act's requirements, while both a co-sponsor of the Act as well as the State's own expert witness contend that Snapchat is regulated." App.391, R.Doc.77.at.39.

### 3. The Arkansas legislature amends the Act, significantly broadening its coverage.

On April 21, 2025—less than a month after the district court held the Act "unconstitutional in all conceivable applications," App.385-86, R.Doc.77.at.33-34—the Arkansas legislature amended the Act. *See* AG.MTD, Ex.3. But it did not revise, let alone repeal, the age-verification and parental-consent requirements. *See* Ark. Code §§4-88-1402(a)-(c), -1403(a). Instead, it deleted the definition of "social media company" without replacing it; significantly broadened the definition of "social media platform"; and added a new, even broader definition of "covered social media platform." *See* AG.MTD, Ex.3.at.2-6; Ark. Code §4-88-1401(5), (11).

13

Appellate Case: 25-1889    Page: 25    Date Filed: 01/23/2026 Entry ID: 5600150

"[S]ocial media platform" is now defined as an entity that operates an online service that is (i) "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication"; (ii) "utilizes … user account[s]"; (iii) allows "a user to create an online profile comprised of personally identifiable information"; (iv) has "features that allow a user to connect, follow, or establish a relationship with other users"; and (v) "[g]enerates revenue primarily through user engagement," including "advertising, user data monetization, or premium content." Ark. Code §4-88-1401(11)(A). "'[C]overed social media platform' means a social media platform, messaging service, or other online platform that requires an internet connection to be accessed and is used or is likely being used by a minor." *Id.* §4-88-1401(5)(A). "Minor" is redefined as an individual under 16 years of age. *Id.* §4-88-1401(9).

Like the original statute, the amended Act contains many speaker- and content-based exceptions. The statute expressly carves out services that offer only provider-generated content, *see id.* §4-88-1401(11)(A), as well as "an email service provider, not-for-profit organization, public or private school, business-to-business software, common carrier, or broadband internet service," *id.* §4-88-1401(5)(B), (11)(B). The statute also continues to exempt "news-gathering organization[s]" and "cloud service providers." *Id.* §4-88-1403(d)(2), (3). The statutory carve-outs for "a

Appellate Case: 25-1889     Page: 26     Date Filed: 01/23/2026 Entry ID: 5600150

news or public interest broadcast, website video, report, or event" likewise remain intact. *Id.* §4-88-1403(d)(1).

While the amended Act is anything but a model of clarity, it appears to contemplate that "social media compan[ies]" (a phrase it no longer defines), "social media platform[s]," *and* "covered social media platforms" must comply with its age-verification and parental-consent regime. Subsections 1402(a)-(c) continue to require "social media compan[ies]" to restrict minors' access to their "social media platforms," and Arkansas itself asserts that "the current Act" subjects "social media platform[s]" to "its age-verification and parental-consent requirements." *E.g.*, AG.Br.50. In addition, the amended Act imposes massive penalties—including damages, court costs, attorney's fees, and a penalty of $10,000 *per day*—on "[a] covered social media platform that permits a minor to access the covered social media platform in violation of this subchapter." Ark. Code §4-88-1403(c)(1).

### 4. The state files a Rule 59(e) motion, takes an appeal, and then moves to dismiss its appeal and vacate the judgment.

On April 28, 2025, Arkansas filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), asserting that the district court had erred in enjoining the whole Act and asking the court to narrow its injunction and declaratory judgment to certain provisions. *See* R.Doc.83. The district court denied that motion, holding that the state's arguments were both forfeited and meritless. App.399-402, R.Doc.97.at.1-4. Arkansas appealed. App.403, R.Doc.98.at.1.

15

On August 5, 2025, the amendments to the Act's definitional provisions took effect. *See* Op. Ark. Att'y Gen. No. 32 (2025). Two weeks later, Arkansas moved "to dismiss [its] appeal as moot and vacate the district court's judgment." AG.MTD.9. NetChoice opposed, explaining that the case is not moot because the amendments "le[ft] in place the age-verification and parental consent requirements that the district court permanently enjoined, which continue to injure NetChoice members in the exact same ways that the district court identified in its well-reasoned opinions." MTD.Opp'n.11. But NetChoice agreed that this Court can review the amendments to the Act to determine whether they cure any of the constitutional problems the district court identified, which Arkansas asked the Court to do in the alternative. *See* AG.MTD.19-20; MTD.Opp'n.1-2. The Court referred the state's motion to the merits panel and ordered briefing to proceed.

## SUMMARY OF ARGUMENT

I. In both its original and its amended form, the Act violates the First Amendment. By restricting access to "social media platforms," Arkansas has with "one broad stroke" prevented its citizens "from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 107-08. And because it continues to exempt certain speakers (e.g., "news-gathering organization[s]," "school[s]," and "not-for-profit organization[s]") and subject matters (e.g., news, educational content, and "public interest broadcast[s]"), Ark. Code §§4-88-

16

1401(5)(B), (11)(B), -1403(d)(1)-(2), the Act triggers strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The Act cannot survive strict—or even intermediate—scrutiny. It is not clear exactly what interest the Act is supposed to advance, but to the extent it advances any legitimate one, it is not remotely narrowly tailored to avoid unnecessary abridgement of speech. Arkansas claims that the Act will protect minors from various harms (e.g., anxiety, sleep deprivation, and sexual predators), but it burdens vast swathes of speech that are unrelated to those concerns. Conversely, the Act leaves unburdened much speech that *does* raise those concerns. Moreover, the Act's parental-consent regime does little to advance the state's asserted interests. As the Supreme Court has held, a one-time parental-consent requirement "is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802. And Arkansas has many less-restrictive means of encouraging parental oversight, including educating its citizens about and encouraging them to use existing parental controls.

With no persuasive First Amendment defense to argue, Arkansas attacks NetChoice's standing. Its arguments are meritless. Arkansas does not (and could not) dispute that NetChoice has Article III standing to sue on behalf of its members. It just asserts that NetChoice lacks "prudential standing" to press its First Amendment claim because it relies on the rights of third parties—i.e., "social media" users. That argument is wrong from start to finish. First, NetChoice is not relying

Appellate Case: 25-1889     Page: 29     Date Filed: 01/23/2026 Entry ID: 5600150

solely on users' rights; it has invoked its members' "own First Amendment rights" to "disseminat[e] protected speech to willing recipients" too. PI.Hr'g.Tr.77:10-78:4. Second, it is well established that a plaintiff who has Article III standing may invoke the First Amendment rights of third parties, *see, e.g.*, *Am. Booksellers*, 484 U.S. at 392-93—which is why every court to consider the state's argument in a challenge to a law like this one has rejected it.

II. The Act is unconstitutionally vague. The vagueness problems were evident before the law was amended and are even more pronounced now. The Act continues to impose onerous obligations on "social media compan[ies]," but it no longer even defines that term. And it does not make clear whether "social media platform[s]" and "covered social media platform[s]" are subject to its age-verification and parental-consent regime. The Act is also vague about the scope of regulated entities' obligations. It does not provide fair notice of whether they must perform age-verification for *all* account holders or only those attempting to open a new account; whether they must prevent minors from accessing their services *without* an account; and the extent to which they must use third-party vendors to perform age-verification rather than performing it themselves.

III. The state's remaining arguments are meritless. The district court correctly enjoined the entire Act, and it was well within its rights to reject Arkansas' severability arguments—which were first raised in a Rule 59(e) motion—as both

Appellate Case: 25-1889     Page: 30     Date Filed: 01/23/2026 Entry ID: 5600150

forfeited and meritless. The court's judgment does not purport to wipe the Act off the books; as Arkansas now concedes, it "properly directs the injunction to [the Attorney General]." AG.Br.53. To the extent the injunction prohibits the Attorney General from enforcing provisions that he lacks power to enforce, the state suffers no harm. And the injunction is best read as affording relief only to NetChoice members since that is the only relief NetChoice sought. This Court should reject Arkansas' untimely scope-of-relief arguments and hold that the Act is (and always has been) unconstitutional.

## STANDARDS OF REVIEW

This Court reviews a summary-judgment order *de novo*. *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1108 (8th Cir. 2020). It reviews a denial of a motion to amend the judgment for "a clear abuse of discretion." *Saylor v. Jeffreys*, 131 F.4th 864, 868 (8th Cir. 2025).

## ARGUMENT

**I.    The District Court Correctly Held That The Act Violates The First Amendment, And It Continues To Do So As Amended.**

**A.    Both Before and After the Amendments, the Act Restricts Massive Quantities of Protected Speech.**

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and

19

listen." *Packingham*, 582 U.S. at 104. Today, those places encompass the "vast democratic forums of the Internet," including "social media" websites. *Id.* The Supreme Court has therefore held that the First Amendment constrains the government's power to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors. *Id.* at 106-08.

In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it furthered its interest in keeping convicted sex offenders away from minors. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. To "foreclose access to social media" is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

For the same reasons, the First Amendment constrains the government's authority to restrict minors' access to those websites. The Supreme Court has

20

Appellate Case: 25-1889     Page: 32     Date Filed: 01/23/2026 Entry ID: 5600150

repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975), and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Just as "the First Amendment strictly limits [the government's] power" to "selectively … shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

Consistent with those principles, the Supreme Court has held that "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, the government could make it "criminal to admit

21

persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce *parental* authority over children's speech; they impose *governmental* authority, subject only to a parental veto." *Id.*

Outside of speech that is *unprotected* for minors (like obscenity), *see, e.g.*, *Free Speech Coal. v. Paxton* ("*FSC*"), 606 U.S. 461, 478 (2025), courts have routinely struck down government efforts to protect minors from purportedly harmful speech on new forms of media. In *Brown*, for example, the Supreme Court held that a California law prohibiting the sale of violent video games to minors without parental consent violated the First Amendment. 564 U.S. at 804-05. And in *Erznoznik*, it held that a local ordinance banning the display of movies containing nudity at drive-in theaters—which was billed as a "means of protecting minors"—violated the First Amendment. 422 U.S. at 212, 217-18. Even when the government restricts access to speech that is *not* protected as to minors, the Court has struck down laws that are not sufficiently tailored to avoid interfering with the speech of adults. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 807 (2000).

2. Given these long-settled principles, it is unsurprising that courts across the country have concluded that state laws restricting minors' access to "social media

Appellate Case: 25-1889     Page: 34     Date Filed: 01/23/2026   Entry ID: 5600150

platforms"—including parental-consent requirements materially identical to those at issue here—violate the First Amendment.  *E.g.*, *Murrill*, 2025 WL 3634112, at *34-37; *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1223-30 (N.D. Ga. 2025); *Yost*, 778 F.Supp.3d at 959; *Reyes*, 748 F.Supp.3d at 1114-15, 1130.[3]  As courts have recognized, such laws even more obviously implicate the First Amendment than the laws invalidated in *Erznoznik* and *Playboy*.  Those cases at least involved an attempt to "adjust the boundaries of an existing category of unprotected speech" (namely, obscenity) "to ensure that a definition designed for adults is not uncritically applied to children."  *Brown*, 564 U.S. at 794; *see also FSC*, 606 U.S. at 471-74.  In contrast, the Act does not even endeavor to confine its restrictions to speech that could arguably be said to approach a constitutional line.  It instead broadly targets websites that "facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication."  Ark. Code §4-88-1401(11)(A)(i).  Arkansas has thus restricted wide swaths of protected speech based on a concern that *some* uses of *some* covered

---

[3] A divided Eleventh Circuit panel stayed the preliminary injunction in *CCIA v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025).  That non-precedential decision is wrong, and the Eleventh Circuit will soon consider the merits of Florida's appeal.  *See* Order at 2, *CCIA v. Att'y Gen.*, No. 25-11881 (11th Cir. Dec. 11, 2025), Dkt.64 (granting motion to expedite).  The Fifth Circuit also stayed the preliminary injunction in *NetChoice v. Fitch*, 2025 WL 2078435 (5th Cir. July 17, 2025), but it provided no reasoning.  And while the Supreme Court denied NetChoice's request to vacate the stay, Justice Kavanaugh noted that the "Mississippi law is likely unconstitutional."  *NetChoice v. Fitch*, 145 S.Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring).

Appellate Case: 25-1889     Page: 35     Date Filed: 01/23/2026 Entry ID: 5600150

services *sometimes* harm *some* minors.  If, in *Brown*, California had restricted access to *all* video games out of concern that some video games may sometimes harm some minors, that would have made the burden on First Amendment rights even more glaring.  *See* 564 U.S. at 793-98; *Packingham*, 582 U.S. at 108-09.

On top of that, by effectively requiring all users to verify their age before accessing covered websites, the Act burdens the rights of *adults* too.  R.Doc.44.at.39-40.  As the Supreme Court recently reaffirmed, requiring adults to submit proof of age before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of" their First Amendment rights.  *FSC*, 606 U.S. at 483.  By forcing adults to surrender sensitive personal information, such requirements "discourage users from accessing" speech and "completely bar" some adults from doing so.  *Reno v. ACLU*, 521 U.S. 844, 856 (1997).  And the unique aspects of websites like Instagram, YouTube, and Snapchat heighten the First Amendment values at stake:  The Act not only abridges users' right to access speech, and NetChoice members' right "to speak … and associate," *CCIA v. Uthmeier*, 2025 WL 1570007, at *16 n.26 (N.D. Fla. June 3, 2025), but also restricts users from engaging in their own speech and participating in the exchange of ideas.

3. Arkansas does not dispute that adults and minors use online services like Facebook and YouTube to engage in protected First Amendment activity.  But it nevertheless tries to evade First Amendment scrutiny by arguing that the Act

24

"regulates conduct, not speech." AG.Br.25 (emphasis omitted). By the state's telling, the Act does not implicate the First Amendment *at all* because it "regulates only non-expressive conduct—platforms allowing children to access a location or product that is [allegedly] dangerous to them." AG.Br.28; *see* AG.Br.29-31. Arkansas also asserts, for the first time on appeal, that the Act should be "construed as a restriction on contracting with children," AG.Br.28; *see* AG.Br.26-28—even though the statute expressly regulates "expression" and restricts "access to … social media" irrespective of any contract. *See* Ark. Code §§4-88-1401(11)(A)(i), 1403(c)(1).

These arguments are meritless. Time and again, courts have held that "the First Amendment right to the 'freedom of speech' protects against not just regulations that directly suppress speech but also those that target activities useful for speaking." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024). A law that precludes the publishing of books, for instance, does not become any more tolerable if it accomplishes that end by banning "purchasing or using ink." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011); *see also Brown*, 564 U.S. at 792 n.1. Just as with library cards, newspaper subscriptions, or any of the myriad other "conduct" providing access to speech, people create "social media" accounts to access services "where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Divorcing the creation of an

Appellate Case: 25-1889    Page: 37    Date Filed: 01/23/2026 Entry ID: 5600150

account from the use of a service to engage in or access speech is thus akin to trying to divorce the act of purchasing a book from the intended objective of reading it. By Arkansas' logic, California could have evaded First Amendment scrutiny in *Brown* by insisting that its law restricted only the "commercial activity" of "contracting with children" for the sale or rental of video games. AG.Br.26, 28. That is fanciful. *See Brown*, 564 U.S. at 792 n.1 (rejecting this argument); *Yost*, 778 F.Supp.3d at 948 ("[T]his Court is unaware of a 'contract exception' to the First Amendment.").

Indeed, the Supreme Court has already held that, when the government "foreclose[s] access to social media," it "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. The Court did so, moreover, while reversing a decision holding that a statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 777 S.E.2d 738, 744 (N.C. 2015), *rev'd*, 582 U.S. 98. Arkansas tries to distinguish the Supreme Court's *Packingham* decision on the ground that the Act does not "foreclose access to social media altogether," since some content on Facebook and YouTube is "available to non-accountholders." AG.Br.28. But it is black-letter law that "burden[s]" on protected speech trigger First Amendment scrutiny just as much as "bans." *Sorrell*, 564 U.S. at 565-66; *accord FSC*, 606 U.S. at 483.

26

Lacking any meaningful response to what the Supreme Court has held about state efforts to regulate "social media," Arkansas persists in the fiction that its law regulates only access to "location[s]," irrespective of "expression that happens to occur on social-media platforms." AG.Br.28; AG.Br.30-31. According to the state, restricting access to websites like Facebook and YouTube is akin to preventing minors from entering bars that serve alcohol. AG.Br.29-30. As the district court put it (with considerable understatement), "the State's analogy is not persuasive." R.Doc.44.at.37. The government has reasons "unrelated to the suppression of free speech" to limit access to establishments that serve alcohol. *FSC*, 606 U.S. at 495-96. Such laws principally regulate the non-speech activity of drinking alcohol; any impact on speech inside those premises is merely "incidental." *See, e.g.*, *Indigo Room, Inc. v. City of Ft. Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013). By contrast, the Act singles out "social media platform[s]" for special burdens precisely *because* they "facilitate … interaction, expression, or communication." Ark. Code §4-88-1401(11)(A)(i).

The Supreme Court's recent decision in *FSC* confirms that the Act burdens speech. The Texas law at issue there required "proof of age to access content that is obscene to minors." 606 U.S. at 482. Because the law "[o]n its face … regulate[d] only speech that is obscene to minors," the burden on the right of adults to access that speech was "only incidental to the statute's regulation of activity that is not

Appellate Case: 25-1889     Page: 39     Date Filed: 01/23/2026 Entry ID: 5600150

protected by the First Amendment." *Id.* at 483. Even so, the Court held that the law triggered heightened scrutiny because of "the incidental burden that age verification necessarily has on an adult's First Amendment right to access [that] speech." *Id.* at 495. If an age-verification requirement that restricts access to speech that is protected only as to adults triggers heightened scrutiny, then an age-verification requirement that restricts speech that is protected as to adults and minors alike triggers heightened scrutiny *a fortiori*.

*TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (per curiam), does not suggest otherwise. The Court there did not hold that the First Amendment did not apply; it assumed that it did. *Id.* at 68-69. And the "unique" law at issue there is nothing like the Act. *Id.* Far from barring users from accessing or creating accounts on TikTok, it prohibited the distribution of a "foreign adversary controlled application." *Id.* at 65-66. In other words, the law principally regulated TikTok's "corporate control," not user access to protected speech. *Id.* at 68. Moreover, the Supreme Court was "mindful" that the law arose in the national-security context, and thus afforded "substantial respect" to the government's concerns that China could exploit TikTok's data for intelligence-gathering or espionage. *Id.* at 74-75.

The other cases Arkansas cites are similarly inapposite. *See* AG.Br.25-26. *Redlich v. City of St. Louis*, 51 F.4th 283 (8th Cir. 2022), involved a law that required a permit to distribute "potentially dangerous food." *Id.* at 284-85. *Arkansas Times*

28

*LP v. Waldrip ex rel. University of Arkansas Board of Trustees*, 37 F.4th 1386 (8th Cir. 2022) (en banc), involved a statute that prohibited state contractors from making "economic decisions that discriminate against Israel." *Id.* at 1394. And *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006), involved a statute that required law schools to allow military recruiters on campus. *Id.* at 64. In each case, the law at issue regulated conduct (*i.e.*, distributing dangerous food, commercial relations with Israel, access to campus), the impact on speech was incidental, and the law was justified by an interest unrelated to the suppression of speech. *See Redlich*, 51 F.4th at 287; *Ark. Times*, 37 F.4th at 1393-94; *Rumsfeld*, 547 U.S. at 67. By contrast, the Act restricts access to services dedicated to speech, and the burdens it imposes on speech are anything but "incidental." *Contra* AG.Br.25.

## B. The Act Continues to Draw Content- and Speaker-Based Distinctions That Trigger Strict Scrutiny.

1. Because the Act restricts protected speech, it is subject to at least intermediate scrutiny. *Packingham*, 582 U.S. at 105; *FSC*, 606 U.S. at 495. Because the Act also discriminates based on content and speaker, it triggers strict scrutiny. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Courts are similarly skeptical of "restrictions distinguishing among different speakers, allowing speech by some but not others."

Appellate Case: 25-1889     Page: 41     Date Filed: 01/23/2026 Entry ID: 5600150

*Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Speaker-based laws "are all too often simply a means to control content," *id.*, as the state may try to muzzle its opponents while "le[aving] unburdened those speakers whose messages are in accord with its own.'" *NIFLA v. Becerra*, 585 U.S. 755, 778 (2018).

Though the April 2025 amendments eliminated some of the original Act's most obvious content-based distinctions, the Act still includes numerous content-based carveouts. Its liability-creating provisions do not cover "news-gathering organization[s]" or "cloud service providers." Ark. Code §4-88-1403(d). Nor do they "[a]pply to a news or public interest broadcast, website video, report, or event." *Id.* The Act also excludes "public or private school[s]," "not-for-profit organization[s]," "business-to-business software," and "email service provider[s]" (among others) from its definition of "social media platform," allowing them to freely disseminate user-generated speech without performing age verification or requiring parental consent. *Id.* §4-88-1401(11)(B). Those exemptions reflect an obvious preference for news, educational materials, and work-related content. That "overt subject-matter discrimination" renders the Act "facially content based." *City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 74 (2022); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) (so holding for law treating "newspapers" more favorably than "commercial handbills").

30

The Act continues to openly discriminate based on speaker in yet another content-based way: It defines regulated entities based on whether they "facilitate *user*-to-user, *user*-to-group, or *user*-to-public interaction, expression, or communication." Ark. Code §4-88-1401(11)(A)(i) (emphasis added). As the district court explained, "[t]his privileges institutional content creators—movie and TV studios, mainstream media outlets, and traditional journalists—over the Soundcloud artist, the TikTok chef, and the citizen journalist." App.376, R.Doc.77.at.24. Numerous courts have thus held that "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation." *Students Engaged in Advancing Tex. v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *see Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953.

That makes sense, as certain types of contents and viewpoints are far more likely to proliferate on websites focused on user-to-user speech than websites focused on provider-generated speech. For example, both Disney+ and YouTube might include videos from the same documentary film. But only YouTube will include user-generated videos critiquing the Disney-produced film as well as responsive comments from other viewers. Both the Washington Post and Reddit include content about politics. But while the Post publishes news about politics, Reddit offers all sorts of other content and viewpoints about the topic—everything from memes to parodies to unfiltered debate and discussion among users. In fact,

31

Appellate Case: 25-1889    Page: 43    Date Filed: 01/23/2026 Entry ID: 5600150

"social media" is popular in part because it provides a forum for less filtered discussions and a broader array of viewpoints than are typically reflected in the state's preferred mediums—e.g., traditional outlets like "*The Washington Post.*" AG.Br.36. Restricting access to websites that disseminate user-generated content while exempting those that offer only provider-generated content necessarily "distort[s] the market for ideas." *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 660 (1994).

2. Arkansas offers little in response. Its claim that the Act does not "draw… speaker-based distinctions," AG.Br.34, is impossible to square with its acknowledgment that the Act exempts "email providers, non-profits, [and] schools" (among others), AG.Br.35. And the state does not even mention the Act's separate exemption for "a news-gathering organization." Ark. Code §4-88-1403(d)(2).

Arkansas' observation that "the Act applies neutrally to speakers that *use* the platforms," AG.Br.36 (emphasis added), misses the point: The Act discriminates *among* "*platforms*" based on the speech they disseminate. For example, the state concedes that the Act restricts the creation of accounts on Facebook but not the Washington Post. AG.Br.36. Though both websites "facilitate user-to-user … communication" (the Post allows account holders to comment on online articles[4]),

---

[4] *See* Washington Post, *Digital Commenting Community*, https://perma.cc/9MR4-KG2S (last visited January 21, 2026).

Appellate Case: 25-1889    Page: 44    Date Filed: 01/23/2026 Entry ID: 5600150

the Post receives favorable treatment because it is a "news-gathering organization," Ark. Code §4-88-1403(d)(2). That is textbook speaker-based discrimination—and content and viewpoint discrimination, to boot.

Arkansas alternatively insists that these speaker distinctions are "permissible" because they are "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." AG.Br.36. But the definitional carveouts for news-gathering organizations, schools, and non-profits have nothing to do with the "form" of their (or their users') expression, and everything to do with its "communicative content." *Contra* AG.Br.35. The same goes for the carveout for "business-to-business software." *Contra* AG.Br.35. And the state simply ignores the Act's exemption for "a news or public interest broadcast, website video, report, or event." Ark. Code §4-88-1403(d)(1).

In sum, the state's efforts to depict the Act as "a content 'agnostic' law," AG.Br.35, are thoroughly unpersuasive. The Act's content- and speaker-based restrictions trigger strict scrutiny.

### C.   The Act Cannot Survive Any Level of Heightened Scrutiny.

The Act cannot survive any level of heightened scrutiny, let alone strict scrutiny—"the most demanding test known to constitutional law," and one that is "fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85. Strict scrutiny requires Arkansas to show that the Act is "the least restrictive means

33

of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires Arkansas to show that the Act is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. The state's asserted interests must be "unrelated to the suppression of free speech," and its chosen solution may not "burden substantially more speech than necessary to further those interests." *FSC*, 606 U.S. at 495-96. The Act flunks both levels of scrutiny.

1. Arkansas insists that the Act serves its interest in "supporting parents in their 'discharge' of their responsibility 'to direct the rearing of their children' and to protect their children." AG.Br.39. The district court rejected that argument below, App.384, R.Doc.77.at.32, and for good reason. The Supreme Court has expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802. And this Court has squarely held that it is not. In *Interactive Digital Software Ass'n v. St. Louis County*, this Court rejected the county's argument that its interest in "assisting parents to be the guardians of their children's well-being" justified an ordinance prohibiting the sale of violent video games to minors without parental consent. 329 F.3d 954, 959 (8th Cir. 2003). As the Court explained, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id.* at 960. "To accept th[at]

34

broadly-drawn interest as a compelling one would be to invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority." *Id.*

Arkansas thus pivots to insisting that the Act serves its interests in "protecting children" from harm. AG.Br.38. While protecting minors is certainly a laudable goal, the state is not even clear as to what purported "harm" the Act is supposed to protect minors from. AG.Br.40. To the extent the state's concern is that certain kinds of user-generated content, such as "cyberbullying," may contribute to "depression," "anxiety," and "eating disorders," AG.Br.4-5, 40, that concern is stated at far too high a level of generality to pass First Amendment muster. It also underscores that the state is concerned with the *content* on "social media platforms." To be clear, NetChoice members strive to remove or restrict access to content that may be harmful to minors (including bullying) from their websites. App.364-66, R.Doc.77.at.12-14. But that undeniably calls for sensitive content-based assessments about a great deal of speech, much of it constitutionally protected. And while the government may have more leeway to restrict access to speech that is *unprotected* as to minors, *see FSC*, 606 U.S. at 472-74, the First Amendment does not allow the government to suppress *protected* speech because it deems it "unsuitable" for minors. *Erznoznik*, 422 U.S. at 213-14; *accord Brown*, 564 U.S. at 794-95.

Appellate Case: 25-1889    Page: 47    Date Filed: 01/23/2026 Entry ID: 5600150

To the extent the state's argument is that the Act protects minors from "developing addictions to social media," AG.Br.40—something it never argued below—that interest is not "unrelated to the suppression of free speech" either. *Cf. FSC*, 606 U.S. at 495-96. After all, the Act's parental-consent regime is not tied to "addiction," let alone addiction to *nonspeech* products like drugs or gambling. It instead broadly restricts minors' access to websites where they access, engage in, and interact with *speech*. And even assuming that "user-to-user, user-to-group, or user-to-public … expression" is meant to be a proxy for "addictive" expression, *cf.* Ark. Code §4-88-1401(11)(A)(i), Arkansas has no legitimate interest in restricting access to speech just because minors find it especially appealing. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576. Arkansas could not validly restrict minors' access to Disney+ because it offers too many shows that "contain … catchy jingles," *Sorrell*, 564 U.S. at 578, any more than it could restrict their access to *Harry Potter* books over fear that some may have a hard time putting them down. *See Angelilli v. Activision Blizzard, Inc.*, 781 F.Supp.3d 691, 701 (N.D. Ill. 2025) (First Amendment foreclosed effort to impose liability for allegedly "'addictive' qualities" of video game). Burdening access to protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

Appellate Case: 25-1889     Page: 48     Date Filed: 01/23/2026 Entry ID: 5600150

2.  In all events, even with its amendments, the Act is not a narrowly tailored means of achieving any of the interests that Arkansas asserts.  Indeed, if anything, the ways in which the amendments substantially broadened the Act's coverage only make the tailoring problem worse.  *See Packingham*, 582 U.S. at 108-09.

The Act "straddles the fence" between "helping concerned parents control their children" and addressing what the state thinks is a "serious social problem." *Brown*, 564 U.S. at 805.  But as a means of assisting concerned parents, the Act "burden[s] substantially more speech than necessary," *FSC*, 606 U.S. at 471, because "it abridges the First Amendment rights of young people whose parents" think the services it covers are harmless, or even an affirmatively good thing for their children. *Brown*, 564 U.S. at 805.  "Not all of the children who are forbidden" to access those services without parental consent "have parents who *care* whether" they do so.  *Id.* at 804.  "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want."  *Id.*  That is "not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*

As for the state's other asserted interests, Arkansas argued below (unpersuasively) that the original statute—which covered only a few of the largest and most popular online services—"target[ed] the types of social media that are most

Appellate Case: 25-1889     Page: 49     Date Filed: 01/23/2026 Entry ID: 5600150

likely to lead to predators contacting minors" and to "mental-health harm." R.Doc.72.at.20; *cf.* App.378-79, R.Doc.77.at.26-27 (rejecting this argument). As amended, however, the Act does not even try to limit its requirements to services that might be thought to pose those risks. It instead broadly restricts access to a "platform, application, or service" that "facilitate[s] user-[generated] … interaction, expression, or communication"—and perhaps even to "online platform[s]" more generally. Ark. Code §4-88-1401(5)(A), (11)(A). These expansive definitions appear to cover a host of services that have virtually nothing to do with the state's asserted interests—e.g., College Confidential, Goodreads, Nextdoor, Pinterest, SSRN, and TeamReach. In short, the Act's "wide sweep precludes access to a large number of websites that are most unlikely" to trigger the state's professed concerns. *Packingham*, 582 U.S. at 114 (Alito, J., concurring); *cf. Ways v. City of Lincoln*, 274 F.3d 514, 518-19 (8th Cir. 2001) (ordinance prohibiting sexual conduct in commercial establishments flunked narrow tailoring because it "could include theater performances" and "other forms of live entertainment" that did not implicate the city's asserted interests).

Making matters worse, the Act "erects barriers to accessing entire social media platforms rather than placing those barriers around the content" that may raise the state's professed concerns. App.382, R.Doc.77.at.30. It restricts minors' access to Facebook and YouTube even if all they want to do is to attend church services,

38

participate in the launch of a presidential campaign, or communicate with friends or family. That is not a remotely tailored means of protecting minors from content that may lead to "anxiety," "depression," or "eating disorders." AG.Br.40. And the Supreme Court has already rejected the argument that barring convicted sex offenders from accessing social media is a narrowly tailored means of addressing the risks they pose to minors. *Packingham*, 582 U.S. at 107-08. A law restricting minors' access to those services flunks narrow tailoring *a fortiori*. As for Arkansas' newfound concerns about purportedly "addictive" features such as "[p]ush notifications, autoplay, infinite scroll," and algorithm-driven "content recommendations," AG.Br.3, the Act covers services regardless of whether they use *any* of these features. This "blunderbuss approach which prohibits mostly innocent speech" is the antithesis of narrow tailoring. *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 642 (1996) (Thomas, J., concurring in the judgment and dissenting in part).

On the flipside, the Act continues to be grossly underinclusive vis-à-vis the state's concerns, "rais[ing] serious doubts about whether the government is in fact pursuing the interest[s] it invokes." App.381, R.Doc.77.at.29 (quoting *Brown*, 564 U.S. at 802). The state claims that the Act targets "addictive" services, the over-use of which may cause "reduced sleep duration." AG.Br.3, 4, 38, 41. Yet the Act does not cover services like Disney+, Hulu, and HBO Max—even when they use "[p]ush

39

Appellate Case: 25-1889     Page: 51     Date Filed: 01/23/2026 Entry ID: 5600150

notifications," "autoplay," and algorithm-driven "content recommendations," AG.Br.3—despite the obvious potential for minors to stay up too late "binging" their favorite movies or TV shows. The state also claims that the Act is geared at combatting "poor mental health outcomes including symptoms of depression and anxiety." AG.Br.4. But, like the parental-consent requirement held invalid in *Brown*, "[t]he Act is also seriously underinclusive in another respect": Arkansas is "perfectly willing" to let a minor have social media accounts "so long as one parent … says it's OK." 564 U.S. at 802. Once the parent allows the child to create an account, the Act imposes no restrictions whatsoever on what content the minor may access, with whom she may interact, or how long she may spend on the website. App.381, R.Doc.77.at.29. That is "not how one addresses a serious social problem." App.381-82, R.Doc.77.at.29-30.

On top of all that, Arkansas has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490. Even under intermediate scrutiny, the government bears the burden of showing "that it seriously undertook to address the problem with less intrusive tools readily available to it," and that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 494-95; *see Packingham*, 582 U.S. at 107. Here, "many tools exist to help parents" restrict or monitor their children's "social

40

Appellate Case: 25-1889     Page: 52     Date Filed: 01/23/2026 Entry ID: 5600150

"media" access—including refusing to give them Internet-connected devices at all. App.361, R.Doc.77.at.9; *see* App.361-64, R.Doc.77.at.9-12. The district court made detailed factual findings about existing parental controls, *see* App.361-64, R.Doc.77.at.9-12, and concluded that giving "notice to parents of their availability is a much less restrictive means of promoting" the state's asserted interests. App.384, R.Doc.77.at.32. Arkansas "offered no evidence to prove this alternative ineffective," App.384-85, R.Doc.77.at.32-33, and it cannot now challenge those findings by pointing to materials outside the record. *See* AG.Br.41-42 & n.13, 45-46; *see also Huelsman v. Civic Ctr. Corp.*, 873 F.2d 1171, 1175 (8th Cir. 1989). For this reason, too, the Act fails any form of heightened scrutiny.

### D. The Act's Unconstitutional Applications Substantially Outweigh Any Constitutional Applications.

A statute facially violates the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723. That test is readily satisfied here. As explained, the Act burdens minors' and adults' access to countless services that allow users to "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (2017); *see supra* pp.19-29. And, given its abject lack of tailoring, it is unconstitutional in all applications. App.385-86, R.Doc.77.at.33-34; *see supra* pp.33-41.

41

Arkansas asserts that "the factual record" contains insufficient "evidence about how the Act would apply to the host of social-media platforms" it covers. *Contra* AG.Br.17. That argument is a red herring. While the Act is vague about exactly which platforms it regulates and what they must do to comply, *see infra* pp.50-54, it plainly restricts speech in every application, as its admitted goal is preventing certain *users* from accessing websites where they engage in "interaction, expression, or communication." Ark. Code §4-88-1401(11)(A)(i). That readily distinguishes this case from *Moody*, as the laws there did not restrict users' access to "social media"; they instead forced websites to disseminate or promote certain speech against their wishes. 603 U.S. at 720. While that kind of law puts the nature and scope of websites' First Amendment rights front and center, the district court correctly recognized that *this* law is invalid based on its sweeping impact on users' (undisputed) First Amendment rights alone. Indeed, before the district court, Arkansas failed to identify *any* scenario in which it thought the Act could constitutionally be applied. App.385-86, R.Doc.77.at.33-34. At any rate, the record conclusively establishes that regulated NetChoice members create and disseminate curated compilations of third-party speech, which *Moody* held is protected First Amendment activity. 603 U.S. at 733-40; *see, e.g.*, App.364, R.Doc.77.at.12-14; App.120, R.Doc.54-2.at.3; App.141, R.Doc.54-3.at.2.

Appellate Case: 25-1889    Page: 54    Date Filed: 01/23/2026 Entry ID: 5600150

On appeal, the state asserts for the first time that the Act has "a myriad of undisputedly lawful applications." AG.Br.47. That argument is forfeited, unsupported by the record, and meritless. Arkansas suggests that the Act could constitutionally be applied to websites that focus on user-generated pornography, but the Act is not directed at user-generated pornography; it "simply impedes access to content writ large." App.382, R.Doc.77.at.30. Indeed, it would make no sense to let minors create accounts on sites that specialize in user-generated pornography— allowing ready access to speech that is obscene for them—whenever one parent consents. *Cf. FSC*, 606 U.S. at 478. If user-generated pornography were truly the state's concern, then it should have tailored its law accordingly. That the Act treats websites with user-generated pornography the same as websites without it just underscores that the Act is not remotely tailored to achieve the state's interests. Far from saving a speech restriction from facial invalidation, insufficient tailoring necessitates it. *See, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 398-99 (2019) (ban on "immoral or scandalous" trademarks was "substantially overbroad" despite potentially constitutional "applications to lewd, sexually explicit, or profane marks"); *United States v. Stevens*, 559 U.S. 460, 482 (2010) (statute banning "depiction[s] of … animal cruelty" was facially unconstitutional even if a narrower ban on "crush videos" would be permissible).

43

Appellate Case: 25-1889     Page: 55     Date Filed: 01/23/2026 Entry ID: 5600150

Arkansas' other belated efforts to imagine constitutional applications are weaker still. It suggests that the Act could be "enforced against platforms that allow children under 13 to open accounts" in violation of their own policies, but it does not explain how this would cure the First Amendment problems. *See* AG.Br.48. And given the considerable burdens it imposes on teens' and adults' protected speech, the Act remains vastly overbroad regardless of any potential application to individuals 12 and under. The state also references §4-88-1404, which prohibits "retain[ing] identifying information about an individual after conducting an age verification," AG.Br.48, but that provision is an adjunct to the unconstitutional age-verification requirement—not a constitutional application of it. *See* App.401-02, R.Doc.97.at.3-4 (rejecting the state's argument that §4-88-1404 is severable from the rest of the Act). The district court correctly held that the Act facially violates the First Amendment.

### E. The District Court Correctly Held That NetChoice Has Prudential Standing to Bring Its First Amendment Claim.

With no viable argument on the merits, Arkansas seeks to avoid First Amendment scrutiny altogether by contesting NetChoice's standing. Arkansas concedes that NetChoice has Article III standing but argues that it lacks "prudential" standing to assert the First Amendment rights of Arkansans who use its members' services. *See* AG.Br.19-22. The district court correctly rejected this argument. R.Doc.44.at.25-29. So has every other court to consider it. *See NetChoice, LLC v.*

44

*Fitch*, 134 F.4th 799, 807 (5th Cir. 2025) ("It is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights."); *accord Murrill*, 2025 WL 3634112, at \*20-21 & n.17; *Uthmeier*, 2025 WL 1570007, at \*9 & n.10; *Yost*, 778 F.Supp.3d at 941-46; *Paxton*, 747 F.Supp.3d at 1031. This Court should too.

To begin, Arkansas' argument rests on the incorrect premise that NetChoice has asserted *only* the rights of third-party users. NetChoice has *also* asserted the First Amendment rights of its members, who disseminate speech through their services. *See, e.g.*, PI.Hr'g.Tr.77:10-78:4, 79:3-82:14, 94:10-95:13; R.Doc.40.at.2-3; R.Doc.2.at.¶¶38-40. Just as the First Amendment protects a newspaper's right to publish articles, op-eds, and reader comments to readers, *see, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974), a broadcaster's right to broadcast programming of its creation or choosing to viewers, *see, e.g.*, *Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994), and a pharmaceutical company's right to disseminate prescriber-identifying information for marketing purposes, *see Sorrell*, 564 U.S. at 570, the First Amendment protects the right of online services like Facebook and Twitter to disseminate both their own speech and "a curated compilation of speech originally created by others," *Moody*, 603 U.S. at 728; *see id.* at 728-32, 735-38; *Yost*, 778 F.Supp.3d at 948.

Appellate Case: 25-1889    Page: 57    Date Filed: 01/23/2026 Entry ID: 5600150

At any rate, Arkansas' argument is foreclosed by the Supreme Court's decision in *American Booksellers*. There, several bookseller organizations and two bookstores brought a First Amendment challenge to a Virginia statute that made it unlawful for booksellers to knowingly display explicit material to minors. 484 U.S. at 387-88 & n.3. Virginia argued that these entities lacked standing to bring their First Amendment challenge because they asserted only the "rights of bookbuyers." *Id.* at 392-93 & n.6. The Supreme Court disagreed: Although "the usual rule is that a party may assert only a violation of its own rights," in "the First Amendment context '[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* The Court therefore allowed the booksellers' associations and bookstores to allege "an infringement of the First Amendment rights of bookbuyers," even though bookbuyers were perfectly capable of asserting their own rights. *Id.* at 388 n.3, 393 & n.6.

*American Booksellers* hardly stands alone. The Supreme Court has repeatedly allowed regulated entities that disseminate speech to invoke the rights of those who would like to access that speech. The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First

46

Amendment right to purchase violent video games without their parents' consent. 564 U.S. at 789. The Court saw no problem with allowing these groups to assert the First Amendment rights of minors; indeed, it repeatedly emphasized minors' rights in striking down the challenged law. *Id.* at 795 n.3, 805; *accord Interactive Digital*, 329 F.3d at 956, 960. The Court has similarly allowed commercial entities that disseminate sexually explicit speech to raise the First Amendment rights of adults who wish to receive such speech. *See, e.g., Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002); *Playboy*, 529 U.S. at 811.

Without even mentioning (let alone distinguishing) *American Booksellers*, Arkansas cites non-First Amendment cases requiring litigants invoking a third party's rights to show (1) "a close relationship with the person who possesses the right" and (2) "a hindrance to the possessor's ability to protect his own interests." AG.Br.20 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Under *American Booksellers* and its progeny, however, neither showing is required when—as here— a litigant raises a facial First Amendment challenge to a restriction on speech. *See, e.g., Fitch*, 134 F.4th at 806-07; *Ways*, 274 F.3d at 518; *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1019 (9th Cir. 2025). As the Seventh Circuit has explained, that is because the "prudential concern" animating those requirements "is outweighed" by the "concern that a law will stifle protected speech." *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996). Accordingly, "third-party standing concerns will not

Appellate Case: 25-1889     Page: 59     Date Filed: 01/23/2026 Entry ID: 5600150

pretermit a facial challenge to a statute on First Amendment grounds" by a party that has Article III standing. *Osediacz v. City of Cranston*, 414 F.3d 136, 140 (1st Cir. 2005); *see, e.g.*, *Uthmeier*, 2025 WL 1570007, at *9 n.10.

Arkansas next claims that "there are conflicts of interest between NetChoice members and users that preclude members from being effective proponents of users' rights," suggesting that some users may support the Act's restrictions. AG.Br.21-22. But the same argument could be made whenever a disseminator of speech invokes recipients' First Amendment rights. Some bookbuyers likely approved of Virginia's restrictions on explicit literature in *American Booksellers*, but that did not make the booksellers any less well-suited to assert the interests of adults who wanted to view such literature. Here too, NetChoice members' interests are fully aligned with the interests of adults and teens who wish to access "social media platforms" without verifying their age or providing proof of parental consent. *See* R.Doc.44.at.29 (concluding that "NetChoice—like the booksellers' association in the *Virginia* case—is in a unique position to advocate for the rights of Arkansas users").

Lastly, Arkansas argues that "NetChoice cannot gain standing to assert users' First Amendment rights by combining associational standing and third-party standing." AG.Br.22-23 (citing only a dissent from an out-of-circuit case). That argument is wrong in both its premise and its conclusion. As explained, third-party standing principles are inapposite twice over: NetChoice has asserted its members'

48

*own* rights (as well as their users' rights), *see supra* pp.44-45, and brought a facial First Amendment challenge, *see supra* pp.45-46. In all events, an organization with associational standing "assert[s] the claims of its members" and stands in their stead, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 33, 342 (1977), and to the extent the organization's members may assert their users' rights, the organization may too. In *American Booksellers*, for example, the Supreme Court held that the bookseller associations could "allege[] an infringement of the First Amendment rights of bookbuyers." 484 U.S. at 388 n.3, 393 & n.6. Likewise, in *Brown*, organizations representing the video game and software industries asserted the First Amendment rights of minors to purchase violent video games without their parents' consent. 564 U.S. at 789. And all four circuit courts to squarely consider the question have found no barrier to combining associational standing and third-party standing. *See Pa. Psychiatric Soc. v. Green Spring Health Servs.*, 280 F.3d 278, 293 (3d Cir. 2002); *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 421-22 (6th Cir. 1996); *Fraternal Ord. of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998), *aff'd in relevant part*, 173 F.3d 898, 903 (D.C. Cir. 1999); *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 108-10 (1st Cir. 2006).[5] It is

---

[5] The Ninth Circuit's decision in *Bonta*, 152 F.4th 1002 (cited at AG.Br.23), does not suggest otherwise. The state cites a dictum asserting that NetChoice members could not bring an *as-applied* challenge based on "third-party internet users'

Appellate Case: 25-1889     Page: 61     Date Filed: 01/23/2026 Entry ID: 5600150

thus unsurprising that courts have repeatedly and resoundingly rejected the notion that NetChoice cannot assert the First Amendment rights of its members' users. *See Fitch*, 134 F.4th at 805-06; *Uthmeier*, 2025 WL 3458571, at \*2.

## II. The District Court Correctly Held That The Act Is Unconstitutionally Vague, And The Amendments Exacerbate That Defect.

Another "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

---

interests." 152 F.4th at 1018. The decision elsewhere acknowledged that "reliance on the speech of nonlitigants is permissible for facial challenges." *Id.* at 1019.

Appellate Case: 25-1889     Page: 62     Date Filed: 01/23/2026 Entry ID: 5600150

That is equally true when it comes to speech restrictions that purportedly protect minors, which the Supreme Court has repeatedly struck down on vagueness grounds. After all, "[i]t is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968); *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 497 (1952); *Winters v. New York*, 333 U.S. 507, 518-19 (1948). And because the Act contains not only civil but also criminal penalties, it is subject to an even more stringent vagueness test. App.386-87, R.Doc.77.at.34-35 (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)); *see City of Chicago v. Morales*, 527 U.S. 41, 55-56 (1999).

Applying this test, the district court held that the original statute "fail[ed] to adequately define which entities [we]re subject to its requirements, risking chilling effects and inviting arbitrary enforcement." App.388, R.Doc.77.at.36. Arkansas' subsequent amendments to the statute only exacerbate these defects. As amended, the Act distinguishes between (i) a "social media company"; (ii) a "social media platform"; and (iii) a "covered social media platform." But the Act is anything but clear about which real-world entities fall into each category and what legal

51

Appellate Case: 25-1889    Page: 63    Date Filed: 01/23/2026 Entry ID: 5600150

obligations they have. Consequently, NetChoice members are left uncertain whether the Act covers them and, if so, what it requires.

The Act imposes several obligations on "social media compan[ies]." *See* Ark. Code §4-88-1403(b)(1), (2)(A). But the April 2025 amendments deleted the statutory definition of that term—without replacing it. *See* AG.MTD, Ex.3.at.2-6. As there is an ongoing debate about what constitutes "social media," *see, e.g.*, App.425, R.Doc.72-1.at.81:10-12; App.507, R.Doc.72-3.at.10:12-13:1, NetChoice members such as AirBnB, Discord, eBay, Etsy, Pinterest, and Snap (among others) are left uncertain about whether they are subject to the substantive obligations of §1402 and 1403(a). Indeed, Arkansas argued below that Snap "is 'different than a traditional social media platform'" because of its focus on direct-messaging, R.Doc.72.at.20, even though the state's own expert opined that it likely met the Act's prior (narrower) definition of that term, PI.Hr'g.Tr.70:23-71:12.

While eBay, Etsy, and Snap may not think of themselves as "social media compan[ies]," they appear to meet the Act's expansive definition of "social media platform." *See* Ark. Code §4-88-1401(11). And because several of the Act's provisions restrict access to "social media platform[s]," *id.* §4-88-1402(a); *id.* §1402(c)(1), they have good reason to be concerned that Arkansas could try to enforce it against them. *See* AG.Br.50; *see also* Ark. Code §4-88-1403(b)(2)(B) (creating private right of action against a "social media platform that is in violation

52

Appellate Case: 25-1889    Page: 64    Date Filed: 01/23/2026 Entry ID: 5600150

of §4-88-1402"). What is more, practically every NetChoice member arguably meets the Act's sweeping definition of "covered social media platform," as that term includes not only "social media" but an "online platform that requires an internet connection to be accessed and is used or is likely being used by a minor." *Id.* §4-88-1401(5)(A). Given the crushing penalties available against "[a] covered social media platform that permits a minor to access [it] in violation of this subchapter"— including damages, court costs, attorney's fees, and a penalty of $10,000 *per day*, *id.* §4-88-1403(c)(1)-(2), (4)—the Act has considerable potential to chill speech across a broad array of online services.

The Act is vague not only as to which entities it covers but also as to the scope of their obligations. It is anything but clear whether regulated parties must perform age-verification for all existing account holders or only new account holders, *compare* Ark. Code §4-88-1402(a), (b)(1), *with id.* §4-88-1402(b)(2); whether they must require parental consent "before allowing [a minor to] access" their services *without* an account, *id.* §4-88-1402(c)(1); and whether or when they must "use a third-party vendor to perform reasonable age verification" rather than performing it themselves, *compare id.* §4-88-1402(b)(1), *with id.* §4-88-1402(c)(1).

Arkansas fails to engage with any of this. Its efforts to defend the original statute are not relevant, *see* AG.Br.49-50; all agree that this Court "must review the challenged state law as it now exists," AG.Br.15 (quoting MTD.Opp'n.1). Its

53

assertion that "the current Act … provide[s] fair notice of what entities are" covered, AG.Br.50, is pure *ipse dixit*. And NetChoice hardly deserves criticism for not "attempt[ing] to show the current Act's terms are vague" in its brief opposing Arkansas' pending motion to dismiss. *Contra* AG.Br.50-51. That brief explained why the case is not moot and appropriately avoided "confus[ing] mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013). *This* brief covers the merits and explains how "vagueness permeates the text of the [Act]," rendering it unconstitutionally vague both on its face and as applied to NetChoice's members. *See Morales*, 527 U.S. at 55 & n.22.

## III. The District Court Correctly Denied Arkansas' Motion To Amend The Judgment.

This Court should make short work of Arkansas' scope-of-relief arguments. To the extent the state raised them below, it did so only in a motion to amend or alter the judgment under Federal Rule of Civil Procedure 59(e). *See* R.Doc.83. The district court was well within its discretion to reject those untimely arguments as both forfeited and meritless.

Arkansas asserts that the court should not have enjoined the Attorney General from enforcing the entire Act. *See* AG.Br.54-55. But at each stage of the proceedings below, NetChoice made crystal clear that it was challenging the entire Act. *See, e.g.*, R.Doc.2.at.¶¶2-5, 35-52; R.Doc.18.at.1-3, 15; R.Doc.55.at.1-3. The district court recognized as much. *See* R.Doc.44.at.49-50; App.355, R.Doc.77.at.3;

54

Appellate Case: 25-1889     Page: 66     Date Filed: 01/23/2026 Entry ID: 5600150

App.393, R.Doc.77.at.41. So did Arkansas. *See* R.Doc.34.at.4, 22-23; R.Doc.72.at.25-26. Yet Arkansas waited to raise its severability arguments until after final judgment. *See* App.400-01, R.Doc.97.at.2-3. The court was justified in rejecting those arguments for that reason alone. *See Banister v. Davis*, 590 U.S. 504, 507-08 (2020) (in resolving a Rule 59(e) motion, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued"). The court also correctly rejected them on the merits: The Act has no severability clause; it was passed as "a *single* section with a single purpose"; its subsections "are interrelated and dependent upon each other"; and its content- and speaker-based coverage formula infects every operative provision. App.401-02, R.Doc.97.at.3-4. Arkansas fails to acknowledge these holdings, much less identify any abuse of discretion. *See* AG.Br.54-55.

Next, Arkansas avers that the injunction is "overbroad" because it supposedly covers provisions that the Attorney General "does not enforce." AG.Br.53; *see* AG.Br.55-56. Again, the state failed to raise this issue until its Rule 59(e) motion, so the district court correctly rejected it as forfeited. *See* App.400-01, R.Doc.97.at.2-3. At any rate, it is far from clear that the Attorney General cannot enforce the statutory provisions the state references, given his broad authority to file actions "for civil enforcement of the provisions of" chapter 88 of the Arkansas Code. Ark. Code §4-88-104. And to the extent the injunction forbids the Attorney General from

Appellate Case: 25-1889     Page: 67     Date Filed: 01/23/2026 Entry ID: 5600150

enforcing provisions that he could not enforce anyway, he suffers no harm—let alone any "manifest injustice," *Sipp v. Astrue*, 641 F.3d 975, 981 (8th Cir. 2011).

The state's assertions that the court violated the "writ-of-erasure fallacy" and rule against "universal injunction[s]," AG.Br.52-53, 56, are likewise forfeited and meritless. This Court "review[s] judgments, not opinions," *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 923 (8th Cir. 2013), and Arkansas concedes that the court's "judgment properly directs the injunction to a party" (namely, the Attorney General). AG.Br.53. And the court's order is no "universal injunction"; the court never suggested that it would apply nationwide or extend relief to non-parties, and NetChoice never sought any such relief. The order is thus best read as enforceable only by NetChoice and its members, consistent with the traditional rule that equitable relief flows only to the parties. *See Trump v. CASA, Inc.*, 606 U.S. 831, 843-44 (2025). And even if it were construed more broadly, Arkansas' failure to object to this aspect of the injunction at any point before this appeal (including its Rule 59(e) motion) should not be excused—particularly since the Attorney General has no valid interest in enforcing the Act against any entity, in any scenario. *See* App.385-86, R.Doc.77.at.33-34 (holding the Act "unconstitutional in all conceivable applications").

Appellate Case: 25-1889    Page: 68    Date Filed: 01/23/2026 Entry ID: 5600150

# CONCLUSION

This Court should affirm.

Respectfully submitted,

*s/*Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
JAMES Y. XI
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee NetChoice, LLC*

January 22, 2026

Appellate Case: 25-1889     Page: 69     Date Filed: 01/23/2026 Entry ID: 5600150

**CERTIFICATE OF COMPLIANCE**

1.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 12,998 words as determined by the word counting feature of Microsoft Word 2016.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

3. Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Statutory Addendum have been submitted to the Clerk via the Court's CM/ECF system.  The files have been scanned for viruses and are virus-free.

January 22, 2026

s/Erin E. Murphy
Erin E. Murphy

# CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy